In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1825

JULIE K. HERTZBERG,

Plaintiff-Appellee,

v.

SRAM CORPORATION,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 6944--Milton I. Shadur, Judge.

ARGUED FEBRUARY 23, 2001--DECIDED August 2, 2001

   Before FLAUM, Chief Judge, and RIPPLE and
WILLIAMS, Circuit Judges.

   RIPPLE, Circuit Judge.   Julie Hertzberg
brought this action against her former
employer, SRAM Corporation ("SRAM"), for
sexual harassment and retaliatory
discharge. A jury returned a verdict in
favor of Ms. Hertzberg on her sexual
harassment claim and awarded her $20,000
in punitive damages. However, the jury
returned a verdict for SRAM on the
retaliatory discharge claim. The district
court nevertheless granted Ms. Hertzberg
equitable relief in the form of back and
front pay. On appeal, SRAM challenges all
of these awards. For the reasons set
forth in the following opinion, we affirm
in part and reverse in part the judgment
of the district court.

I

BACKGROUND

A.  Facts

   In November 1994, SRAM, a manufacturer
of bicycle components, hired Ms.
Hertzberg as a shipping coordinator in
its Elk Grove Village, Illinois
warehouse. Almost immediately, Ms.
Hertzberg experienced difficulties with
Manuel Loayza, a co-worker. On numerous

occasions, Loayza told Ms. Hertzberg that she was not as qualified as he, that women could not perform shipping responsibilities as well as men and that he would take over her job. Ms. Hertzberg also had disagreements with Loayza about shipping procedures and about a book that Loayza had failed to return to Ms. Hertzberg.

Ms. Hertzberg was upset by Loayza's comments and, according to her testimony, complained to her immediate supervisor, Brian Lester, on at least three occasions./1 During one of their meetings concerning Loayza, Lester told Ms. Hertzberg that she was "being too emotional, just like a woman." R.68 at 34. The last time that Ms. Hertzberg spoke to Lester concerning Loayza's remarks, Lester put his hand on Ms. Hertzberg's knee and told her he would take care of it. Ms. Hertzberg perceived that Lester was unable or unwilling to curb Loayza's behavior. Consequently, she ceased bringing her complaints to Lester.

On the advice of another SRAM employee, Dee Whatmore, Ms. Hertzberg complained to plant manager George Margelos concerning Lester's and Loayza's behavior toward her. Whatmore accompanied Ms. Hertzberg to Margelos' office; there, Ms. Hertzberg reported Lester's actions, as well as detailed the problems that she had been experiencing with Loayza. According to Ms. Hertzberg, Margelos "seemed to shrug . . . off" her concerns. R.68 at 54. Following this meeting, Margelos had at least one discussion with Lester concerning the propriety of Lester's touching Ms. Hertzberg. Ms. Hertzberg apparently did not have any further difficulties with Lester. The record is inconsistent regarding the actions Margelos took with respect to Loayza. Margelos testified to at least one conversation with Loayza about his comments that occurred shortly after Ms. Hertzberg's complaint; Loayza remembered this conversation, too, but believed that it occurred after Ms. Hertzberg's departure had become a fait accompli. Loayza apparently never was warned formally or disciplined for his comments, and, despite Ms. Hertzberg's repeated complaints to Margelos, the comments continued unabated until her departure from SRAM.

Ms. Hertzberg's employment with SRAM ended on February 6, 1995, although how it ended is not clear. Ms. Hertzberg testified that she was terminated from her employment by Lester because she was being "too disruptive." Id. at 55. Ms. Hertzberg's ex-husband and Whatmore both confirmed that Ms. Hertzberg had told them that she was fired. Lester and Margelos, however, denied terminating Ms. Hertzberg. They testified that Ms. Hertzberg gave two weeks' notice. Shortly thereafter, she informed Lester that she was reconsidering. Margelos told Lester, however, that they were going to hold firm to her resignation./2

After leaving SRAM, Ms. Hertzberg wrote to SRAM's president, Stan Day. In the letter, she related her history of problems with Loayza, that she had voiced concerns about "certain procedures Manuel was using" and that she did not believe Loayza was a "team play[er]." Def.'s Ex. 1. She also told Day that she had not intended to resign, but only had wanted her concerns addressed. She did not request any action from Day, but provided her number to him "[i]f [he] would like to respond." Id. Ms. Hertzberg did not state that she had been the victim of sexual harassment, nor did she inform Day that her discharge was motivated by her harassment-related complaints.

During the time that Ms. Hertzberg was employed at SRAM, SRAM had in place a sexual harassment policy. The policy required that complaints be made through the chain of command, all the way to Day. Ms. Hertzberg had seen the employment manual containing the sexual harassment policy on only one occasion; she did not have a personal copy of the employment manual and, therefore, was not familiar with the requirements of the policy. Margelos testified that he was familiar with the policy and that the policy stated that SRAM did not tolerate sexual harassment. Lester had the same understanding of the policy. Neither individual, however, had received training in harassment issues or how to conduct a sexual harassment investigation.

B.  District Court Proceedings

After pursuing her claims through administrative channels, Ms. Hertzberg

filed a two-count complaint in district court. In her complaint, Ms. Hertzberg first alleged that she had been sexually harassed by Loayza and Lester. The second count of her complaint alleged that SRAM had fired her in retaliation "for having opposed and complained about the hostile and offensive work environment." R.1 at 5. Ms. Hertzberg's complaint did not include a claim for discriminatory discharge, only retaliatory discharge. Ms. Hertzberg did not allege, either as part of count one or as a separate count, that she was constructively discharged-- that her working conditions were so intolerable that she was forced to resign.

Ms. Hertzberg's claims proceeded to trial. After the close of Ms. Hertzberg's case, and again at the end of all of the evidence, SRAM moved for judgment as a matter of law on all aspects of Ms. Hertzberg's claims, including the availability of punitive damages. The district court reserved ruling on the motion.

The jury then was instructed on Ms. Hertzberg's claims of sexual harassment and retaliatory discharge. These were the only two bases of recovery submitted to the jury. The jury returned a verdict for Ms. Hertzberg on the sexual harassment claim for which it awarded her $20,000 in punitive damages./3 The jury, however, returned a verdict for SRAM on the retaliatory discharge claim.

Ms. Hertzberg then sought equitable relief from the district court in the form of back pay and front pay. She claimed that she was entitled to approximately $56,000 in back pay and ten years' front pay based on her actuary's testimony. Ms. Hertzberg did not file a supporting memorandum with the district court detailing why she was entitled to lost wages in the absence of a jury finding that she had endured a discriminatory discharge, actual or constructive.

In response, SRAM argued that back and front pay were available to Title VII plaintiffs only when they had proven discriminatory discharge. Because Ms. Hertzberg never had claimed that she was constructively discharged, and because the jury rejected her retaliatory

discharge claim, SRAM maintained that lost pay was not available to Ms. Hertzberg./4

The district court disagreed. It found that there was a "but for" relationship between Ms. Hertzberg's departure and the sexual harassment. Tr. of Dec. 16, 1999, at 9. Therefore, even though Ms. Hertzberg had not suffered a constructive discharge, she could still receive damages for lost pay./5 Ruling on SRAM's motion for judgment as a matter of law, the district court also upheld the jury's punitive damages award. Consequently, it entered a final judgment of $66,829.18 in Ms. Hertzberg's favor; the sum represented $20,000 in punitive damages awarded by the jury, and $44,112.18 in back pay and $7,717 in front pay awarded by the court. SRAM timely appealed.

II

DISCUSSION

SRAM now seeks review of the district court's post-trial rulings. SRAM first submits that the district court should not have awarded back pay and front pay to Ms. Hertzberg. Second, SRAM contends that the district court erred in its calculation of the lost pay award. Finally, SRAM argues that the district court should not have left the jury's punitive damage award undisturbed.

A.  Lost Pay

SRAM maintains that the district court should not have awarded lost pay because Ms. Hertzberg did not plead or prove a cause of action that entitled her to back or front pay. Whether lost pay is available as a remedy for a statutory violation is a question of law that we review de novo. See Selgas v. Am. Airlines, Inc., 104 F.3d 9, 12 (1st Cir. 1997) ("Our review of the district court's decision that both front pay and reinstatement could be awarded together as part of the remedies available to a Title VII plaintiff is de novo, as we review for legal error."). The district court's decision to award lost pay and the amount of that award, assuming statutory authorization, is reviewed only for an abuse of discretion. See Downes v. Volkswagen of Am., Inc., 41 F.3d 1132,

1141 (7th Cir. 1994) ("The statute also affords the court discretion to award front pay according to the circumstances of each case.").

In its decision to award lost pay, the district court acknowledged that it was bound by the jury's verdict on the retaliation claim. It also acknowledged that constructive discharge had not been submitted to the jury or proven. Nevertheless, it decided that back pay and front pay could be awarded because "but for" SRAM's harassment Ms. Hertzberg would not have left her employment. We believe that the district court's approach blurs the distinction between hostile work environment and constructive discharge cases, and between monetary damages and equitable relief.

It is well established that Title VII encompasses a cause of action for sexual harassment. We have held that a cause of action for sexual harassment arises when the conduct has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1143 (7th Cir. 2001) (internal quotation marks and citations omitted). Further, the conduct at issue must be sufficiently severe or pervasive that a reasonable person would find it hostile and that the victim subjectively sees it as abusive. See Murray v. Chicago Transit Auth., 252 F.3d 880, 889 (7th Cir. 2001)./6

In addition to defining actionable sexual harassment, our case law has distinguished "ordinary" sexual harassment from "aggravated" sexual harassment. Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 677 (7th Cir. 1993). In the "ordinary" case, the employer engages in or condones hostile conduct that interferes with the employee's ability to perform his or her job. See Wolf, 250 F.3d at 1143. In such circumstances the employee "is expected to remain on the job while seeking redress" of the harassment. Id. (internal quotation marks and citations omitted). In the "aggravated" case, the employer not only interferes with the employee's performance, but "'makes an employee's working conditions so intolerable that the employee is forced into an

involuntary resignation.'" Saxton v. Am. Tel. & Tel. Co., 10 F.3d 526, 536-37 (7th Cir. 1993) (quoting Weihaupt v. Am. Med. Ass'n, 874 F.2d 419, 426 (7th Cir. 1989) (emphasis in original)). When working conditions reach these depths, an employee need not remain on the job, but may resign and seek his or her remedies in court. See Chambers v. Am. Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir. 1994) ("Thus, courts have said that where conditions are so intolerable that a reasonable person would feel compelled to resign, a plaintiff may do that, and then sue for reinstatement and back pay.").

The distinction between "ordinary" and "aggravated" harassment is not one merely of semantics; whether harassment is ordinary or aggravated affects the damages available to the plaintiff. A brief history of damages under Title VII is helpful in understanding this distinction. Before Congress enacted the Civil Rights Act of 1991 ("the 1991 Act"), Title VII allowed for only equitable remedies, such as reinstatement, back pay in lieu of reinstatement and injunctive relief./7 In response to this limitation, courts developed the constructive discharge doctrine. See Chambers, 17 F.3d at 1005. "Thus, courts . . . said that where conditions are so intolerable that a reasonable person would feel compelled to resign, a plaintiff may do that, and then sue for reinstatement and back pay." Id. However, the constructive discharge doctrine did not assist those whose working conditions were unreasonable, but not intolerable. Indeed, one congressional report noted that "[b]ack pay as the exclusive monetary remedy under Title VII has not served as an effective deterrent, and, when back pay is not available, as in the case where a discrimination victim remains on-the-job or leaves the workplace for reasons other than discrimination, there is simply no deterrent." H.R. Rep. No. 102-40 (I), at 154 (1991). Consequently, in the 1991 Act, Congress expanded the types of remedies available to Title VII plaintiffs to compensate those left unaided by the original statute. See H.R. Rep. 102-40 (II), at sec. 8 (1991) (establishing the need for expanded remedies in light of the examples of women who were severely harassed but received little or no relief).

The new damage provisions of the 1991 Act are codified at 42 U.S.C. sec. 1981a, which states:

In an action brought by a complaining party . . . against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) . . . the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. sec. 2000e-5(g)], from the respondent.

42 U.S.C. sec. 1981a(a)(1). In adopting this language, "Congress sought to expand the available remedies by permitting the recovery of compensatory and punitive damages in addition to previously available remedies, such as front pay." Pollard v. E.I. du Pont de Nemours & Co., 121 S. Ct. 1946, 1952 (2001). Thus, the 1991 Civil Rights Act addressed the disparity in treatment by providing additional remedies; it left undisturbed the equitable remedies available under Title VII. Indeed, Congress explicitly provided that the new remedy provisions did not subsume the old Title VII remedies. See 42 U.S.C. sec. 1981a(b)(2). Section 1981a (b)(2) states: "Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964." 42 U.S.C. sec. 1981a(b)(2).

More important for our purposes, the 1991 Act also left undisturbed the showing that a plaintiff must make to obtain equitable relief: A victim of discrimination that leaves his or her employment as a result of the discrimination must show either an actual or constructive discharge in order to receive the equitable remedy of reinstatement, or back and front pay in lieu of reinstatement. In the absence of such a showing, a plaintiff's exclusive remedies are those set forth in 42 U.S.C. sec. 1981a.

We are not alone in reaching this conclusion. Two circuits that have faced this issue have held that back pay and

front pay may not be recovered in the absence of a finding of discriminatory discharge. See Mallinson-Montague v. Pocrnick, 224 F.3d 1224 (10th Cir. 2000); Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216 (8th Cir. 1997). In Pocrnick, a district court had rejected the plaintiffs' plea for front and back pay following a jury's determination that they had not suffered constructive discharges. See 224 F.3d at 1226. The plaintiffs cross-appealed on this basis, but the Tenth Circuit stated:

Because the remedies available under sec. 1981a do not displace or alter the remedies available under pre-1991 Title VII law, but instead merely supplement those remedies, and because sec. 1981a(b)(2) specifically precludes the award of back pay as part of the new compensatory remedies provided therein, the district court concluded that "there is nothing in the 1991 Amendments to suggest that the case law applying those prior remedies is abrogated. Instead, it appears that those prior remedies, and the case law applying those remedies remain intact." Accordingly, the district court further concluded that the Plaintiffs' entitlement to back pay was controlled exclusively by sec. 2000e-5(g) and the case law interpreting it and not by the separate, supplemental remedies set out in sec. 1981a.

Id. at 1237 (footnotes omitted). The appellate court adopted this reasoning and upheld the judgment.

The Eighth Circuit held similarly in Caviness. There, the jury had awarded the plaintiff $51,000 in damages on her sexual harassment claim. The defendant argued that the award must be vacated because the actions occurred pre-1991 and, therefore, only equitable remedies were available to the plaintiff. The district court recognized that the plain tiff was limited to pre-1991 Act remedies; nevertheless, it upheld the award and recharacterized it as back pay. The defendant appealed, and the Eighth Circuit reversed. In resolving the issue, the court first noted that "the recovery of monetary damages by successful plaintiffs on claims of discrimination under Title VII before the 1991 Act was limited to equitable forms of relief, such as back pay, and the circumstances

under which such monetary equitable relief was available were likewise limited." Id. at 1219. Consequently, even

"if unlawful discrimination was proved, under prior [pre-November 1991] law a Title VII plaintiff could not recover monetary relief unless the discrimination was also found to have some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential in compensation, or termination." Sexual harassment occurring before November 1991 ordinarily does not have the sort of concrete economic effect required for the recovery of money damages under Title VII. The exception would be sexual harassment that resulted in constructive discharge . . . . In that case, back pay (and front pay) would be potential remedies. But in the absence of constructive discharge, a plaintiff subjected to sexual harassment, no matter how egregious, is not "made whole" by the equitable remedy of back pay.

Id. (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 254 (1994)) (alteration in original). Because, the plaintiff had not alleged constructive discharge, and because no other theory of discriminatory discharge was submitted to the jury, the Eighth Circuit reversed the back pay award. See id./8

The requirement that a plaintiff establish a discriminatory discharge in order to receive lost pay precludes such a recovery for Ms. Hertzberg in the present case. We agree with the district court that Ms. Hertzberg's lawyers, "in the nature of their presentation, may have shot themselves or their client in the foot on the retaliation claim by the instruction that limited adverse employment action to a termination of plaintiff's employment by defendant," Tr. of Dec. 16, 1999, at 6-7; that is, Ms. Hertzberg may well have convinced a jury that she had been constructively discharged. However, Ms. Hertzberg presented only two bases of relief to the jury: sexual harassment and retaliatory discharge. The jury rejected Ms. Hertzberg's retaliatory discharge claim. Consequently, there was no discriminatory discharge on which the award of lost pay could be based, and we must reverse the lost pay award.

B.  Punitive Damages

   SRAM also contends that the district court erred when it failed to grant SRAM's motion for judgment as a matter of law on Ms. Hertzberg's punitive damage claim. We review the denial of a motion for judgment as a matter of law de novo. See Emmel v. Coca-Cola Bottling Co., 95 F.3d 627, 629 (7th Cir. 1996). In addressing the issue, we ask "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed," here, Ms. Hertzberg. Tapia v. City of Greenwood, 965 F.2d 336, 338 (7th Cir. 1992).

   SRAM first argues that Ms. Hertzberg did not suffer severe sexual harassment. SRAM also maintains that nothing in the record suggests that SRAM's management knew that its actions with respect to Ms. Hertzberg might violate federal law. Finally, SRAM contends that punitive damages should be foreclosed to Ms. Hertzberg because she did not utilize her last avenue of redress under SRAM's harassment policy-- an appeal to SRAM's president. Consequently, SRAM believes, Ms. Hertzberg cannot establish punitive damages as a matter of law.

   We believe these arguments must be rejected in the wake of Kolstad v. American Dental Association, 527 U.S. 526 (1999). In Kolstad, the Supreme Court set forth the elements that a plaintiff must establish in order to receive punitive damages under the 1991 Act. According to the statute, stated the Court, the employer must act with malice or reckless indifference to the plaintiff's federally protected rights. "The terms 'malice' or 'reckless indifference' pertain to theemployer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad, 527 U.S. at 535. Restating the standard in a slightly different formulation, the Court held: "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Id. at 536. Consequently, although the egregiousness of the conduct might support an inference that the employer acted with the

requisite state of mind, a showing of egregiousness is not an independent requirement of a punitive damages award. See id. at 537-38.

This court applied the Kolstad standard in Bruso v. United Airlines, Inc., 239 F.3d 848 (7th Cir. 2001). In Bruso, we discussed Kolstad's "three-part framework for determining whether an award of punitive damages is proper under the statutory standard." 239 F.3d at 857. The first step requires the plaintiff to "demonstrate that the employer acted with the requisite mental state." Id. However, we continued,

[t]he employer need not be aware that it is engaging in discrimination. Instead, it need only act in the face of a perceived risk that its actions will violate federal law. A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws.

Id. at 857-58 (internal quotation marks and citations omitted)./9 Once the plaintiff has met this burden, the plaintiff "must demonstrate that the employees who discriminated against him are managerial agents acting within the scope of their employment." Id. However, even if the plaintiff meets these burdens, "the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." Id.

We believe that the evidence, together with the reasonable inferences that the jury was entitled to draw from that evidence, were sufficient to allow a jury to resolve these issues in favor of Ms. Hertzberg. With respect to the first element, there was evidence that both Lester and Margelos "knew of . . . the antidiscrimination laws and the employer's policies for implementing those laws." Id. at 858. Specifically, Lester testified that SRAM had a sexual harassment policy and, although he could not remember the specifics of the policy, he believed it required an investigation and an attempt to reach a resolution between the parties. Furthermore, when asked about his response to Ms.

Hertzberg's complaint about Loayza, Mr. Lester replied: "I spoke with Manuel. I told him that Julie thought his jokes were inappropriate and so did I. And that he should stop doing that immediately. It was incorrect behavior in the workplace." R.68 at 119. Consequently, Lester's knowledge of the existence of SRAM's policy is undisputed. Furthermore, a jury reasonably could infer from Lester's statements to Loayza that Loayza's comments were "inappropriate" and "incorrect" because they were illegal. See Alexander v. Fulton County, 207 F.3d 1303, 1338 n.28 (11th Cir. 2000) (holding that sheriff's testimony that he "would never assert" that it was "okay to fire someone because of their race" was sufficient to establish that he acted with the requisite mental state); cf. Ogden v. Wave Works, Inc., 214 F.3d 999, 1010 (8th Cir. 2000) (holding that the combination of familiarity with company policy and training in harassment issues was sufficient evidence from which a jury could conclude that a managerial employee acted in the face of a perceived risk that his actions violated federal law).

The same is true of Margelos. When asked about SRAM's policy on sexual harassment, Margelos responded: "Well, certainly it's not tolerated. If we're made aware of any issues, we would address them immediately." R.68 at 248. Furthermore, when detailing his discussions with Lester regarding Lester's touching Ms. Hertzberg, Margelos stated:

I told Brian [Lester] exactly what Julie [Hertzberg] and Dee [Whatmore] had told me. And that Julie felt that it was inappropriate. I told Brian, you know, that kind of behavior, regardless of what, you know, might be just incidental contact or whatever can be misinterpreted by other people and it[']s very offensive.

R.68 at 256. Margelos, therefore, like Lester, expressly testified to knowledge of SRAM's policy. Furthermore, like Lester, the jury reasonably could conclude that Margelos understood that certain conduct that was "inappropriate" or "offensive" might be illegal. See Alexander, 207 F.3d at 1338. Consequently, we do not believe that we can reverse the jury's verdict of punitive damages with respect to Ms.

Hertzberg's showing on this first element.

As stated above, however, our inquiry does not end here. Ms. Hertzberg also must show that either Lester or Margelos was a "managerial agent[ ] . . . acting within the scope of [his] employment." Bruso, 239 F.3d at 858. This is "necessarily a fact-intensive inquiry" driven by "the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out." Id.

Although the evidence in the record concerning Lester is sparse, it does not appear from the evidence that Lester's responsibilities rendered him a managerial agent. There is little evidence in the record concerning Lester's day-to-day authority in overseeing the shipping department. However, there was testimony from both Lester and Margelos that Lester had little discretion in hiring, disciplining or terminating employees that reported to him. According to Lester, he had only a "[s]mall amount" of input in hiring those who would work under him. R.68 at 116. Furthermore, Lester had no power to terminate employees without Margelos' approval. Because the little evidence presented suggests that Lester's authority and discretion was limited, we do not believe a jury reasonably could conclude that Lester was SRAM's managerial agent. Cf. Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 447 (4th Cir. 2000) (holding that a supervisor was a managerial agent because she "had the authority to make personnel decisions . . . without guidelines or review, and thus was able to make personnel decisions without any objective criteria or accountability"), cert. denied, 121 S. Ct. 66 (2000); EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1247 (10th Cir. 1999) (holding that employees with the ability to suspend, hire and fire subordinates occupied management positions for purposes of imposing punitive damages).

We cannot reach the same conclusion with respect to Margelos. Margelos was plant manager at the Elk Grove Village facility and "general manager for [SRAM's] U.S.

operations." R.68 at 243. He hired the staff for the Elk Grove Village plant, he took care of personnel issues and he had the authority to discipline and terminate the employment of those who worked for him, directly or indirectly. We believe this evidence provides a sufficient basis from which a jury could conclude that Margelos was SRAM's "managerial agent[ ] acting within the scope of [his] employment" for purposes of addressing Ms. Hertzberg's complaints about Loayza. Bruso, 239 F.3d at 858.

The issue then becomes whether a reasonable jury could conclude that SRAM failed to make "good faith efforts to implement an antidiscrimination policy." Id. "[A]lthough the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award." Id. at 858. Taken in the light most favorable to Ms. Hertzberg, the evidence establishes a lack of a good faith effort to insulate Ms. Hertzberg from Loayza's harassment. The testimony of Lester and Margelos established that Ms. Hertzberg complained about Loayza's gender-based harassment. See R.68 at 119 (testimony of Lester that he "recall[ed] that Julie said that Manuel was making jokes about women"); id. at 278 (testimony of Margelos characterizing Hertzberg's complaints as concerning Loayza's "demeaning and patronizing" attitude). Furthermore, Ms. Hertzberg testified that Loayza would make gender-related comments to her constantly--"at least over 100 times"during the course of her four-month employment. Id. at 62. When Ms. Hertzberg reported these incidents to Lester, she was told she was being "too emotional." Id. at 34. When she proceeded through the chain of command and went to Margelos, he "seemed to shrug it off," id. at 54; indeed, both managers were ineffective in addressing the problem because Loayza's badgering did not stop. See Bruso, 239 F.3d at 861 (finding this element of Kolstad met because Bruso introduced evidence at trial that suggested that United's top management officials disregarded its zero-tolerance policy by turning a blind eye to the harassment that they knew was occurring); Deffenbaugh-Williams v. Wal-Mart Stores,

Inc., 188 F.3d 278, 286 (5th Cir. 1999) (considering management's failure to respond effectively to complaints as evidence of lack of good faith)./10 There also was evidence that Margelos failed to follow SRAM's procedure for receiving complaints because he did not put them in writing. Finally, although SRAM argues that Ms. Hertzberg did not make an appeal to the company president (as allowed by its policy), there is evidence in the record that SRAM did not provide its employees ready access to its sexual harassment policy, nor did a management employee inform Ms. Hertzberg of this avenue of redress. Cf. Faragher v. City of Boca Raton, 524 U.S. 775, 809 (1998) (holding that city could not establish affirmative defense to sexual harassment complaint--that it took reasonable care to prevent and correct harassing behavior--in light of "complete failure" to promulgate sexual harassment policy).

Given the constant nature of the harassment and SRAM's lack of managerial response to the problem, we believe a jury was entitled to conclude that SRAM did not make good faith efforts to implement its sexual harassment policy. Consequently, because a reasonable jury could have found that Ms. Hertzberg met her burden with respect to punitive damages, we shall not disturb its verdict.

Conclusion

For the foregoing reasons, we reverse that portion of the district court's judgment awarding front and back pay, and we affirm the judgment with respect to the award of punitive damages. The parties shall bear their own costs in this court.

AFFIRMED IN PART; REVERSED IN PART


FOOTNOTES

/1 Lester, who also was Loayza's immediate supervisor, testified that he recalled only one complaint from Ms. Hertzberg, that he spoke to Loayza and that he told Loayza that the comments were inappropriate.

/2 At some point after Ms. Hertzberg resigned, SRAM made the decision simply to pay Ms. Hertzberg her

remaining salary without having her finish out her last two weeks.

/3 Compensatory damages were foreclosed to Ms. Hertzberg as a result of her discovery responses. During discovery, SRAM queried Ms. Hertzberg concerning her damages from the alleged harassment. In response to a discovery request, Ms. Hertzberg itemized only lost wages as her damages. SRAM also asked Ms. Hertzberg at her deposition about her damages. Ms. Hertzberg responded that she only had lost pay damages. These responses prompted SRAM to file a motion in limine to preclude Ms. Hertzberg from introducing any evidence at trial concerning compensatory damages for emotional distress. Relying on Ms. Hertzberg's discovery responses, the district court granted SRAM's motion in limine. Consequently, the issue of compensatory damages was not submitted to the jury. The fact that Ms. Hertzberg did not recover compensatory damages does not affect the jury's award of punitive damages. See Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010 (7th Cir. 1998) (holding that there was "no legal flaw[ ]" in a jury's award of punitive damages in the absence of a compensatory damage award).

/4 SRAM also took issue with the amount of lost wages Ms. Hertzberg claimed. According to SRAM, the testimony of Ms. Hertzberg's actuary rested on the faulty assumption that she would have worked ten hours of overtime per week for ten years. Furthermore, SRAM objected to any back or front pay that extended beyond May 1998, the time when SRAM's Elk Grove Village facility closed.

/5 Additionally, the district court rejected many of SRAM's arguments regarding the speculative nature of an extended front pay award. The court stated: "Finally, SRAM's several objections to the quantification of that lost income recovery do not rise above the level of captiousness. For one thing, it was SRAM's misconduct that created any difficulty in proving such damages with precision." R.57 at 5.

/6 "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

/7 See Tobey v. Extel/JWP, Inc., 985 F.2d 330, 332 (7th Cir. 1993) ("Although sexual harassment is a form of sex discrimination forbidden by Title VII, damages are not available under that statute for sexual harassment as such--because Title VII is not a damages statute.") (citations omitted);

King v. Bd. of Regents of the Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir. 1990) ("Compensatory, nominal, and punitive damages are not available under Title VII.").

/8 Some circuits have crafted a narrow exception to this general rule for failure-to-promote cases. In a failure to promote case, a plaintiff may seek back pay for periods beyond the employee's voluntary resignation "when the employee was preparing to enter an entirely different career with the same employer." Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1495 (9th Cir. 1995) (internal quotation marks and citations omitted). In Odima, the court stated:

An employee who has been discriminatorily denied an opportunity for a promotion ordinarily may not collect backpay for periods beyond that employee's voluntary resignation unless the employee demonstrates that she was constructively discharged by the employer. That doctrine does not apply, however, when the employee was preparing to enter an entirely different career with the same employer.

Id. In these cases, "an employer's discriminatory denial of the employee's opportunity to enter an entirely different career constitutes a refusal to hire; thus, the limitation on backpay in promotion cases does not apply." Id.; cf. Wells v. North Carolina Bd. of Alcohol Control, 714 F.2d 340, 342 (4th Cir. 1983) (holding that back pay was available to stock clerk who, but for the company's discrimination, would have been promoted to a sales clerk position and consequently would not have suffered a back injury that resulted in his leaving his stock clerk position). Ms. Hertzberg, however, has made no claim for failure to promote. Consequently, even if we were to adopt our colleagues' reasoning, the exception is inapplicable to the case now before us.

/9 Another way a plaintiff may meet this burden is "by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir. 2001).

/10 Although Margelos and Lester testified that they spoke with Loayza, and that Ms. Hertzberg reported no further complaints (indeed, that she had told them that the situation was improving), the jury was entitled to credit Ms. Hertzberg's version of events. See, e.g., Europlast, Ltd. v. Oak Switch Sys., Inc., 10 F.3d 1266, 1275 (7th Cir. 1993) (allowing that a jury may credit the testimony of one witness over another).