In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 17-2432 & 17-2454

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellee/*
*Cross-Appellant*

*v.*

COSTCO WHOLESALE CORPORATION,

*Defendant-Appellant/*
*Cross-Appellee.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-06553 — **Ruben Castillo**, *Chief Judge.*

_____

ARGUED FEBRUARY 13, 2018 — DECIDED SEPTEMBER 10, 2018

_____

Before SYKES and BARRETT, *Circuit Judges*, and GRIESBACH, *Chief District Judge*.[*]

BARRETT, *Circuit Judge*. Dawn Suppo, an employee of Costco Wholesale Corporation, was stalked by Thad Thompson, a customer of Costco, for over a year. Things got so bad

_____

[*] Of the Eastern District of Wisconsin, sitting by designation.

at the end that Suppo secured a plenary no-contact order from an Illinois state court. Traumatized by the experience, she also took an unpaid medical leave, and when she didn't come back, Costco terminated her employment.

The Equal Employment Opportunity Commission (EEOC) sued Costco on Suppo's behalf, alleging that Costco had subjected her to a hostile work environment by tolerating Thompson's harassment. After the jury rendered a verdict in the EEOC's favor, Costco moved for judgment as a matter of law and the EEOC moved for backpay. The district court denied both motions, and both parties appeal.

We conclude that the district court was right to deny Costco's motion for judgment as a matter of law, because a reasonable jury could conclude that Thompson's conduct was severe or pervasive enough to render Suppo's work environment hostile. The district court was only half right, however, with respect to the EEOC's motion for backpay. We agree with the district court that Suppo cannot recover backpay for the period of time after Costco fired her. But it should have considered whether Suppo was entitled to backpay for some or all of her time on unpaid medical leave.

I.

The evidence frequently conflicted during the trial, but because the EEOC won a verdict on Suppo's behalf, we recount the facts in the light most favorable to her. We look at the record as a whole, give her the benefit of every inference, and refrain from making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); s*ee also Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 393 (7th Cir. 2005). Our task is to determine whether a juror

inclined to believe Suppo's side of the story could reasonably conclude that Costco subjected her to a hostile work environment.

A.

Costco is a warehouse club open to members who pay an annual fee. It offers a wide range of goods—everything from groceries to furniture—at its many locations around the country. In 2009, Suppo began working at Costco's store in Glenview, Illinois as a seasonal, part-time employee; in May of 2010, she transitioned to regular, part-time status. Her duties included doing "go-backs"—re-shelving items that members decided not to purchase. Go-backs required Suppo to circulate around the large warehouse with a shopping cart, returning items to the sections where they belonged. Most, if not all, of her encounters with Thompson occurred while she was doing go-backs.

Suppo encountered Thompson for the first time in May or June of 2010. Thompson referred to Suppo by her first name, which he read from her employee nametag. He noted that he had seen her "speaking to one of the guys up front" and asked what Suppo describes as "a few personal questions," such as where she lived. Suppo replied that it was nice to meet him, but she had to return to work. A few days later, they had a similar encounter: Thompson approached her, asked questions that Suppo considered personal, and Suppo replied that she had to go back to work. Suppo did not immediately report these interactions to Costco management. But they had unnerved her, and two months later, she related them to Don Currier, her direct manager. She told Currier that she was scared, and he instructed her to notify him if she saw Thompson again.

Shortly after her conversation with Currier, Suppo did see Thompson again. This time, he was wearing "sunglasses and a hat" while "watching [her] in different aisles and hiding behind the clothes." When Thompson realized that she had seen him, he told Suppo that she "looked scared" and left. Suppo notified Currier, and Currier, Greg West (Assistant General Manager), and Daniro Hernandez (a loss-prevention officer) brought Thompson into the warehouse office, where they told him to "avoid [Suppo] and … not talk to her." Thompson was defensive and angry; he loudly stated that it is a "free country" and invoked his "freedom of speech." He nonetheless agreed to stay away from Suppo. Currier told Suppo about the meeting and instructed her to follow up with him if she had future concerns about Thompson.

Suppo remained frightened by this third interaction with Thompson and decided to contact the police. She filed a report stating that Thompson had been asking personal questions and "hiding behind clothes watching her." Later that day, the police called Suppo about her report while she was in the warehouse office with Currier and West. After she hung up, West yelled at her and told her to "be friendly to" Thompson. The police interviewed Thompson, but they did not arrest or charge him. Instead, they filed a half-page report relating Suppo's claims that "Thompson was stalking her while she was at Costco," that she could "feel him looking at her," and that "when she looks at him he looks down." The report also noted that Thompson had apologized and said that he would avoid Suppo in Costco.

But Thompson did not avoid Suppo. The two encountered one another multiple times over the next 13 months, although Costco and the EEOC disagree about how many. Costco

insists before us (as it did before the jury) that Thompson and Suppo could not have seen one another more than 20 times during this 13-month period, because Thompson's purchase record reflects that he was in the warehouse during only 20 of Suppo's 308 scheduled shifts. As the EEOC pointed out at trial, however, Costco only records when members purchase items, not when they enter the warehouse, and Suppo testified that Thompson's cart was sometimes empty when she saw him. Thus, Thompson could have been in the warehouse much more often than his purchase record reflects. Suppo also testified that Thompson "constantly" tried to talk to her and "constantly" tried to give her his phone number. Based on the EEOC's evidence, the jury could infer both that Thompson approached Suppo very frequently and that he sometimes came to the warehouse to see her rather than to shop. It was not required to credit Costco's claim that the two saw one another no more than 20 times.

Suppo described her interactions with Thompson as follows. On two occasions, she saw him "coming around the aisle just watching [her]," which made her "uncomfortable." On other occasions, he talked to her. Suppo testified that Thompson expressed some (though not all) of his questions "in a sexual way." He asked (often repeatedly) where she was from, what her nationality was, where else she worked, where else she went, where she lived, what else she did, if she had a boyfriend, which male employees she spoke to, and the identity of a man she shopped with. Suppo described each of these questions as "intimate" because each made her feel "uncomfortable." On various occasions, he told her she was "pretty," "beautiful," and "exotic." He asked how old she was. Two or three times Suppo told him she would not answer, and Thompson mused that "he couldn't tell if [she] was 17 or 27."

(Suppo was in her 40s at the time.) Thompson told her that she "look[ed] scared" and asked several times whether "he freak[ed her] out." He tried to give her his business card on one occasion (pushing it into her hand "two, three, and four times"), asked her out on dates approximately six times, and "constantly" tried to give her his phone number. He also closely observed her appearance: For example, on a day that he saw her twice, he "noticed that she had obviously powdered her face" between the first and second times that he saw her. On another occasion, he noticed that her eye makeup had been applied unevenly.

There was also some physical contact. Thompson used his shopping cart to bump into Suppo or her cart four times. He touched her twice: On one occasion, Thompson touched her face under her eye, noting some darkness. On another, he touched her wrist, commenting on her veins and a sore on her hand that was healing slowly. Thompson also attempted unsuccessfully to hug Suppo twice.

Currier was present for two of these encounters: once when Thompson pulled his cart up next to Suppo before going to the restroom, and once when Thompson asked Suppo a few questions on the warehouse floor before she walked away from him and toward Currier. After the first instance, Currier told Suppo he was watching Thompson. After the second, Currier talked to Thompson. Suppo asked if she could park closer to the store's entrance to avoid being in the parking lot alone. When Costco denied her request, her father began picking her up from work.

On September 1, 2011, Suppo was returning items throughout the warehouse as part of her "go-back" duties. While she was in the fish aisle, Thompson walked up to her

and asked if they could talk. Suppo said no, and Thompson, red-faced, "whipped" his cart around and left. Shortly afterward, Suppo was in the candy aisle near the registers when she saw Thompson with his phone over his head, videotaping her "from afar." She said, "I told you to leave me alone." Thompson retorted, "Okay, I'll leave you alone, mysterious Dawn." Suppo returned to work. In the meantime, Thompson saw Currier on the warehouse floor and claimed that while he had just encountered Suppo, she had initiated the contact.

Things moved quickly after that. On September 8th, Suppo secured a Stalking No Contact Order against Thompson from the county circuit court; the order forbade Thompson from approaching Suppo at her residence or place of employment for 21 days. On September 11th, Suppo went on a medical leave of absence from Costco. And on September 19th, the General Manager of the Glenview Costco told Thompson not to shop at the Glenview location anymore; he suggested that Thompson shop at Costco's Mettawa location, which was a comparable distance from Thompson's home. Thompson agreed. When the emergency no contact order expired at the end of the month, Suppo secured a plenary No Contact Order against Thompson for a full year.

Costco continued its investigation after Suppo went on medical leave. On October 4th, the Assistant Vice President of the Midwest Region sent a letter to Thompson notifying him that Costco was aware of Suppo's complaints to both management and the Glenview police. The letter formally directed Thompson to shop at the Mettawa warehouse instead of the one in Glenview. On November 23rd, the General Manager of the Glenview store sent an investigation closure letter to Suppo, informing her that although the company could not

confirm a violation of its harassment policy, it had instructed Thompson not to shop at the Glenview warehouse.

Unfortunately, the closure letter did not mark the end of Suppo's interactions with Thompson. A few months later, she saw him while she was shopping with her father at Costco's Mettawa warehouse, where Thompson had been told to shop. Thompson screamed profanity at them. This happened on a Friday; Costco revoked Thompson's membership the following Monday. It forbade Thompson to enter any Costco warehouse without direct permission from the warehouse General Manager or the Assistant Vice President of the Midwest Region.

In November of 2012, per company policy, Costco terminated Suppo because her unpaid medical leave of absence had extended beyond twelve months.

B.

The EEOC filed suit on Suppo's behalf. Its complaint alleged that Costco had discriminated against her because of her sex "by creating and tolerating a sexually hostile work environment of offensive comments of a sexual nature, unwelcome touching, unwelcome advances, and stalking by a customer." It also accused Costco of constructively discharging Suppo. The district court granted Costco summary judgment on the constructive discharge claim, but it allowed the hostile work environment claim to go to trial. At the close of the EEOC's case, Costco moved for judgment as a matter of law, and the district court denied the motion. After the jury awarded Suppo $250,000 in compensatory damages, Costco renewed its motion for judgment as a matter of law and asked in the alternative for a new trial. The EEOC moved for

backpay and various forms of injunctive relief. The district court denied all post-trial motions. Costco appeals the denial of its motion for judgment as a matter of law, and the EEOC cross-appeals the denial of backpay.

## II.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). An employer violates this provision when "discrimination based on sex … create[s] a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). This case is unusual because it involves alleged sexual harassment by a customer rather than by a supervisor or coworker. That does not get Costco off the hook, however, because an employer can be liable for a hostile work environment that results from the acts of non-employees, including customers. *Dunn v. Washington Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998) ("[T]he same standard of liability applies to both co-worker and customer harassment.").

To establish a hostile work environment claim, a plaintiff must show that she was "(1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008). The third factor—the only one that Costco contests—requires the unwelcome conduct to be severe or pervasive from both a subjective and an objective point of view. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). This case turns on the objective prong: Costco concedes that Suppo subjectively perceived

Thompson's conduct to be severe or pervasive, but it argues that no reasonable person would have experienced it that way.

To be severe or pervasive enough to create a hostile work environment, conduct must be "extreme." *Id.* at 788. Determining whether behavior crosses that threshold is not subject to "a mathematically precise test." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Rather, it depends on "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. With that standard in mind, we evaluate Costco's appeal.

## A.

Costco grounds its attack on the jury's verdict in the content of Thompson's comments to Suppo and the nature of his physical contact with her. As for Thompson's comments, Costco insists that they were "tepid" compared to those that we have held insufficiently severe or pervasive to create a hostile work environment. On the scale of vulgarity, Costco is right—unsuccessful Title VII plaintiffs have endured far worse. *Baskerville v. Culligan International Co.* is a good example. There, we held that an employer was entitled to judgment in a case in which the behavior of the plaintiff's supervisor included making masturbation gestures while conversing with her, grunting suggestively as she turned to leave his office, referring to her as a "pretty girl," and commenting that his office did not get "hot" until she walked in. 50 F.3d 428, 430 (7th Cir. 1995). Thompson's attempts to solicit

biographical information from Suppo, compliments on her appearance, and requests for dates were nowhere near this lewd.

The same is true of the occasions on which Thompson touched Suppo. Costco correctly observes that we have held conduct that is more amorous and similarly pervasive to be insufficiently hostile to sustain a claim under Title VII. For example, in *McPherson v. City of Waukegan*, we held that a supervisor did not severely or pervasively harass plaintiff by asking what color bra she was wearing, pulling back the shoulder strap of her tank top to see for himself, and suggesting that he "make a house call" when she called in sick. 379 F.3d 430, 438–39 (7th Cir. 2004). In *Adusumilli v. City of Chicago*, we held that a coworker did not severely or pervasively harass the plaintiff by making sexual comments and touching her arm, fingers, or buttocks, on four occasions. 164 F.3d 353, 361–62 (7th Cir. 1998). Thompson's physical contact with Suppo—touches on the wrist and cheek, bumps with a shopping cart, and attempted hugs—was less sexually suggestive than conduct that we have already described as falling below the bar. Because Thompson's come-ons were so mild, Costco says, the district court should have granted it judgment as a matter of law.

Yet Costco's argument implies a position inconsistent with our case law: that harassment must be overtly sexual to be actionable under Title VII. To be sure, the alleged harassment must occur because of the plaintiff's sex.[1] *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 750 (7th Cir. 2018). But it need not

---

[1] Costco does not dispute that Thompson focused his attention on Suppo because she is female.

consist of pressure for sex, intimate touching, or a barrage of deeply offensive sexual comments. *Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012). Actionable discrimination can take other forms, such as demeaning, ostracizing, or even terrorizing the victim because of her sex. *See, e.g., id.* at 663–64 (supervisor created a hostile work environment by "demeaning, degrading and demoralizing" the plaintiff); *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (supervisor isolated the plaintiff from her coworkers); *Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 664–65, 667 (7th Cir. 2001) (coworker terrorized the plaintiff). Here, we must decide whether a reasonable juror could find Thompson's conduct objectively intimidating or frightening.

In making this assessment, we do not—as Costco would have it—consider only what Thompson said and where he touched her. As we have emphasized before, "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall*, 713 F.3d at 331 (quoting *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000)). We determine whether a workplace was hostile based on "all the circumstances" of the case. *Harris*, 510 U.S. at 23; *see also Hall*, 713 F.3d at 331 (severity and pervasiveness must be judged by "the totality of the circumstances"). And in the circumstances of this case, Thompson's talking and touching took place in the context of his stalking.

Suppo testified that Thompson's presence at the Glenview Costco was "constant." He followed Suppo around the store, watching her from around corners. He stared at her from behind clothes racks, disguised in sunglasses and a hat. He monitored her movements and asked her to account for her

conversations with men. He made trips to the warehouse to see Suppo rather than to shop. He "constantly" asked her out and "constantly" tried to give her his phone number. And Thompson continued this dogged pursuit of Suppo even after Don Currier told him to stay away from her, even after he knew that Suppo had gone to the police, even after he had assured both the police and Currier that he would avoid her, and even though he knew that his attention scared her. His behavior culminated in the bizarre, objectively frightening act of filming Suppo, whom he called "mysterious Dawn." A reasonable juror could conclude that being hounded for over a year by a customer despite intervention by management, involvement of the police, and knowledge that he was scaring her would be pervasively intimidating or frightening to a person "of average steadfastness." *Frazier*, 263 F.3d at 668.

Thompson's outburst in the Mettawa warehouse supports this conclusion. When Thompson saw Suppo and her father there, he screamed expletives. This outburst did not contribute to the hostility of Suppo's workplace because it occurred after Thompson had been banned from the Glenview store. It is relevant, however, to the jury's evaluation of Thompson's behavior during the 13-month period in which he interacted with Suppo at Glenview. Costco depicted Thompson as friendly but overeager; the EEOC portrayed him as unstable and obsessive. A reasonable juror aware of both the filming at Glenview and the outburst at Mettawa could view Thompson's behavior between May of 2010 and September of 2011 through the lens of the EEOC's portrayal.

Last but certainly not least is the plenary "no contact" order issued by the state court.[2] According to Costco, the evidence construed in the light most favorable to the EEOC permits only one conclusion: that Suppo is an eggshell plaintiff whom Thompson pestered rather than harassed. That position is exceedingly difficult to maintain in light of the state court's conclusion that Thompson violated the Illinois Stalking No Contact Order Act. The then-effective version of that Act provided that "'[s]talking' means engaging in a course of conduct directed at a specific person" when the stalker "knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety … or suffer emotional distress." 740 ILCS 21/10 § 10 (2010).[3] It defined a "course of conduct" as "2 or more acts, including but not limited to acts in which a respondent directly [or] indirectly … follows, monitors, observes, surveils, threatens, or communicates to or about, a person, [or] engages in other contact …." *Id*. And it described "emotional distress" as "significant mental suffering, anxiety or alarm." *Id.* After an adversarial hearing, the state court concluded that Thompson had violated this statute and issued a no-contact order prohibiting him from (among other things) coming within 200 feet of Suppo's place of employment for a year. Given the state court's judgment that Thompson engaged in a course of conduct that would "cause a reasonable person to fear for his or her safety … or suffer emotional distress," it would be quite

---

[2] The state court initially issued an emergency, 21-day no-contact order based on evidence submitted by Suppo. *See* 740 ILCS 21/95. It issued the plenary no-contact order after an adversarial process.

[3] The Illinois legislature recently made minor amendments to § 10. Public Act 100-1000 (2018).

something for us to say that a jury acted unreasonably by reaching the same conclusion.

### B.

It bears emphasis that an employer is not vicariously liable for the sexual harassment of its employee by a customer. There must be "a basis for employer liability," *Lapka*, 517 F.3d at 982, and an employer is responsible for its own negligence if it is "reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises … under his control." *Dunn*, 429 F.3d at 691 (quoting the Restatement (2d) of Agency § 213(d)); *see also Lapka*, 517 F.3d at 985 ("Title VII requires only that the employer take steps reasonably likely to stop the harassment."); *Frazier*, 263 F.3d at 666 ("[A] violation of Title VII that is based on a claim of harassment by a coworker doesn't occur until the employer has failed to take reasonable steps to bring the harassment to an end."). Costco's liability therefore depends not only on what Thompson did, but also on how Costco responded. And while Costco did respond to Suppo's complaints about Thompson, it does not challenge the jury's decision that its response was unreasonably weak. Because Costco doesn't press that point, we don't address it. Costco's only challenge is to the jury's conclusion that Thompson severely or pervasively harassed Suppo, and as we have explained, that is a losing argument.

### III.

On cross-appeal, the EEOC argues that the district court erred in denying its motion for backpay covering the period during which emotional distress rendered Suppo unable to

work—a period that the EEOC defines as running from September of 2011, when Suppo went on unpaid medical leave, to December of 2014, a little more than two years after Costco terminated her. The district court's decision was driven by its view that backpay is available only to remedy discriminatory *discharge*. Suppo could not recover backpay for the time between September 11, 2011 and November 19, 2012 because she remained employed by Costco while she was on medical leave. And she was not constructively discharged on November 19, 2012 because she did not quit: Costco fired her because she had exhausted the 12-month leave of absence available under her Employee Agreement, and it could not reasonably accommodate her request for indefinite leave.[4] Because Suppo could not show that she was constructively discharged either when she left for medical leave or when she was terminated, the district court reasoned, she was not entitled to backpay.

The district court got it right with respect to the EEOC's claim for backpay after Costco terminated Suppo. We have said that "[w]e can make it no plainer than to reiterate that constructive discharge 'refers to a situation in which the employee is not fired but quits.'" *Jordan v. City of Gary*, 396 F.3d 825, 837 (7th Cir. 2005) (quoting *McPherson*, 379 F.3d at 440).

---

[4] Costco contacted Suppo on September 20th, notifying her that her leave of absence had expired and requesting a time to discuss her return to work. On October 4th, Suppo submitted a form from a physician indicating that she would be unable to work for 1–2 years. On October 10th, Costco informed Suppo that it interpreted her need for leave as "indefinite," and that it would proceed with the termination process unless she provided additional information by October 25th. Suppo did not respond, and Costco sent her a termination letter on November 19th, explaining that it could not accommodate indefinite leave.

Suppo did not quit; she was fired because she did not comply with Costco's requirement that she return to work. That was the equivalent of walking off the job, and an employee who fails to return to work rather than resigning cannot bring a constructive discharge claim. *Id.*

The district court misinterpreted our precedent, however, when it stated that backpay is unavailable to remedy wages lost during an unpaid leave. The district court reached that conclusion based on *Hertzberg v. SRAM Corp.*, which holds that "[a] victim of discrimination [who] leaves his or her employment as a result of the discrimination must show either an actual or constructive discharge in order to receive the equitable remedy of [backpay]." 261 F.3d 651, 659 (7th Cir. 2001). The district court understood this to mean that any victim of discrimination must show actual or constructive discharge to recover backpay. But *Hertzberg* only addresses what a plaintiff who "*leaves his or her employment*" must show—such a plaintiff must show that her employer made her working conditions so intolerable that she was forced to quit. *Id.* at 658. *Hertzberg* does not address whether a plaintiff can recover backpay if she does not leave her employment.

*Townsend v. Indiana University* answers that question. 995 F.2d 691, 693 (7th Cir. 1993). There, the plaintiff took unpaid leave after being sexually assaulted at work. Her employer insisted that the she was not entitled to backpay because she remained an employee. We rejected the proposition that "involuntary termination, whether in the form of outright discharge or of constructive discharge (where the employer makes life so unbearable for the employee that the latter quits) is a sine qua non to prevailing under Title VII." *Id.* at 693. We held that the plaintiff could seek backpay for the wages she

lost while on an unpaid leave that sexual harassment had forced her to take. *Id.*

The district court treated *Hertzberg* as superseding *Townsend*, because we decided *Hertzberg* after a 1991 amendment to Title VII authorized the recovery of compensatory and punitive damages. *See* 42 U.S.C. § 1981a(1) (providing that a plaintiff can recover compensatory and punitive damages in addition to equitable relief). But *Hertzberg* emphasizes that the new remedies provisions "left undisturbed" the previously available equitable remedies like backpay. *Id.* at 659. In so doing, it expressly embraces rather than impliedly overrules our preexisting case law on backpay.[5] *Id.* ("There is nothing in the 1991 Amendments to suggest that the case law applying those prior [equitable] remedies is abrogated." (quoting *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1237 (10th Cir. 2000)). *Townsend* remains good law.

Thus, the EEOC can recover backpay on Suppo's behalf if it can show that Suppo's work environment was so hostile that she was "forced to take unpaid leave." *Townsend*, 995 F.2d 693. As with constructive discharge, a mere causal link between the discrimination and the change in employment status is insufficient. The victim of the harassment must establish that her working conditions were so objectively intolerable that they forced a change in employment status—here, from regular employment to unpaid leave. If a reasonable person in Suppo's shoes would have felt forced by unbearable working conditions to take an unpaid medical leave in September

---

[5] It is also worth noting that even though *Townsend* arose before the statute was amended, it was decided afterward. *Townsend*, 995 F.2d at 694. Yet the opinion contains no suggestion that backpay for unpaid leave was a one-trip ticket.

of 2011, then Suppo is entitled to recover backpay for some period of time following the involuntary leave.[6] That period, however, cannot extend beyond the date that Costco terminated her employment.

\* \* \*

The district court properly denied Costco's motion for judgment as a matter of law. But because it did not address whether the sexual harassment that Suppo suffered while at Costco forced her to take unpaid medical leave, we REMAND to the district court so that it can decide that question in the first instance.

---

[6] Backpay "is a reasonable estimate of the harm suffered as a result of [the adverse employment action]," determined by (1) "measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by [the] defendant" and (2) reducing that amount if the defendant can show "failure to take reasonable efforts to mitigate her damages." *Horn v. Duke Homes*, 755 F.2d 599, 606–08 (7th Cir. 1985).