09-1306-cv
Pucino v. Verizon Communications

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

AUGUST TERM, 2009

(Argued: December 4, 2009          Decided: August 13, 2010)

Docket No. 09-1306-cv

------------------------------------------------------------------

JOAN PUCINO,

Plaintiff-Appellant,

DEBORA COLE and MARYANNE DAUER,

Plaintiffs,

v.

VERIZON COMMUNICATIONS, INC.,

Defendant-Appellee.

------------------------------------------------------------------

B e f o r e:   WINTER, RAGGI, and LIVINGSTON, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Paul G. Gardephe, Judge) granting defendant's motion for summary judgment dismissing appellant's hostile work environment claim.  We vacate and remand.

STEPHEN BERGSTEIN (Helen G. Ullrich, on the brief), Bergstein & Ullrich LLP, Chester, New York, for Plaintiff-Appellant.

CARLA R. WALWORTH (Christopher Reilly & Stephen B. Kinnaird on the

brief), Paul, Hastings, Janofsky & Walker LLP, New York, New York, for Defendant-Appellee.

GAIL S. COLEMAN (James L. Lee, Deputy General Counsel; Lorraine C. Davis, Acing Associate General Counsel; Carolyn L. Wheeler, Assistant General Counsel on the brief), United States Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae United States Equal Employment Opportunity Commission.

WINTER, Circuit Judge:

Joan Pucino appeals from Judge Gardephe's grant of summary judgment dismissing her claim that Verizon Communications, Inc., maintained a hostile working environment at the garage where she was employed. We vacate and remand.

BACKGROUND

a) Factual Background

Given that this appeal is from a grant of summary judgment, we view the evidence in the light most favorable to appellant. See Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). Our recitation of the facts, therefore, is simply a description of the evidence appellant proffered in opposition to the motion for summary judgment.

Pucino began working for Verizon's predecessor company in 1982, at first as a long-distance operator and then, from 1991 until the end of 2002, as a field technician in Newburgh, New York. Field technicians install and repair telecommunications

2

cable.  Pucino worked at Pierce's Road Garage from 1991 to 1995 and was then transferred to the Union Avenue Garage, where she worked until her retirement in December 2002.  The Union Avenue Garage employed anywhere from sixty to one-hundred-and-ten field technicians at a time during this period, but never more than five of them were women at any one time.

Justin Hinspeter and Kevin Moore served as foremen at the Union Avenue Garage between 1995 and 2001.  Foremen were responsible for assigning work and equipment to technicians and for monitoring the quality of that work.  Hinspeter and Moore routinely assigned her work that was less desirable than the work assigned to male workers.  Pucino was frequently assigned to work alone in parts of Newburgh considered unsafe.  Men were never assigned to work alone in those areas.  Hinspeter and Moore also insisted that Pucino first call one of them when she needed assistance on a job, while the two foremen allowed male workers to call directly to dispatch for help.  The foremen often refused Pucino's requests for help when she called and would instead show up to monitor her work.  On several occasions, Hinspeter would deny Pucino's requests for assistance on the ground that no one was available to help but then, in Pucino's presence, would grant a male worker's request for help.  Hinspeter told Pucino to "get lost" and to "go kill herself" on occasions when she pointed out this inconsistency in treatment.

Pucino also stated that Hinspeter would routinely change her work location even though it was common practice to allow technicians to work continuously in one area of the city so that they could become familiar with it. On at least ten occasions, Hinspeter skipped over her when it was her turn to receive overtime work, even though such work was usually assigned equally to all field technicians on a rolling basis.

Two of Pucino's co-workers corroborated Pucino's account of Hinspeter's behavior with respect to work assignments. Maryanne Dauer stated that Hinspeter also sent her into two-man areas of Newburgh alone even though men never had to work there alone. Dauer received such assignments about once a week while working out of the Union Avenue Garage. Robert Burton, a male coworker in the Union Avenue Garage, stated that he had observed Hinspeter and Moore harass Pucino when she requested assistance on assignments that were routinely "two-man" jobs. Hinspeter once threatened Burton with discipline because he had asked Pucino to help him out on a project where the use of a second worker was routine and never questioned by the foremen. Hinspeter even warned Burton to stay away from Pucino, saying that Pucino was "trouble." He thereafter questioned Burton closely whenever Burton worked with Pucino.

Beyond work assignments, Pucino stated that, on many occasions, Hinspeter would grant her male co-workers access to

4

the very tools that he had just told her were unavailable.  She specifically recalled one occasion when Hinspeter granted Andy Embler's request for a "B tool" (used to open boxes) when he had denied the same request from her moments earlier.  Denial of tools made it difficult, if not impossible, for her to perform her work properly.

The Verizon foremen routinely denied Pucino access to bucket trucks even though she was eligible for them under company policy.  A bucket truck is a large pick-up truck equipped with an enclosed platform attached to a mechanical arm that, when lifted, makes it possible to reach overhead telecommunications wires.  Field technicians prefer bucket trucks to the alternative -- vans with large ladders -- because the trucks are safer, easier to use, and reach much higher.  Because of their desirability, the foremen made permanent and temporary bucket truck assignments to men based on seniority.  Pucino stated that foremen at both Pierce's Road Garage and Union Avenue Garage would frequently deny her requests for a bucket truck notwithstanding her seniority over the male co-workers who received them.  She specifically recalled that co-workers Ted Saltershack, Paul Martinex, and Bob Wilkens received bucket truck assignments even though she had more seniority than any of them.  Pucino also stated that the few trucks she did receive were older and in worse shape than those assigned to less senior males and that

even these trucks were soon given away to other workers or else taken out of service because of their age.

Dauer described a similar experience with bucket truck assignments. Dauer worked at Pierce's Road Garage from 1995 until July 2001, when she was transferred to the Union Avenue Garage along with co-worker Danny Piperato. Both Dauer and Piperato took their permanently-assigned trucks with them. Upon Dauer's arrival at the Union Avenue Garage, Hinspeter gave her truck to a male worker with more seniority while allowing Piperato to keep his truck at the expense of more senior males. Dauer further recalled that many of her requests for a temporary bucket truck were denied in favor of less senior male workers.

Pucino stated that Hinspeter and Moore often reprimanded her for behavior that was commonplace, and unremarked upon, among the men. For example, although there was no company policy against using public bathrooms and male co-workers openly used them while out in the field, Hinspeter and Moore reprimanded Pucino for being "off the job" on occasions when she used public facilities. Pucino preferred public bathrooms because the bathrooms where she worked were unisex, generally dirty, and also lacked doors or other security to prevent men from walking in. Dauer also attested to the bad conditions of Verizon's unisex bathrooms. Dauer stated that, while working at Pierce's, she became aware of the "off the job" reprimands Pucino had received for using public

bathrooms.  Fearing similar discipline, Dauer began to document her own travel time to bathrooms in Verizon offices several miles from where she worked, which were segregated by sex.

As another example of discriminatory discipline, Pucino testified that Hinspeter and Moore had reprimanded her for stopping at a store for a cold drink, even though it was commonplace for male workers to do the same on hot days.  The foremen then implemented a new policy prohibiting such stops and openly blamed Pucino for that policy.

Finally, Pucino stated that Hinspeter and Moore subjected her to harsher, more public criticism than male co-workers.  Hinspeter "constantly" called Pucino a "bitch" and "stupid" and also would tell her to "go fuck herself."  And while male workers were usually criticized privately for their mistakes, Pucino's affidavit claimed that Hinspeter and Moore had repeatedly singled her out for intense and often public criticism.

There was evidentiary corroboration of these claims.  Gregory Irvin, a union shop steward who observed the workplace, said that Hinspeter would insult male co-workers by calling them "just as productive as [Pucino]."  Irvin further said that "Hinspeter singled [Pucino] out for rougher, longer and more vicious treatment than anyone else."  Burton stated that Hinspeter and Moore "constantly" watched Pucino, "far in excess" of their supervision of any male coworker in the same work group.

7

Dauer, for her part, testified that Hinspeter subjected her to much the same treatment. For example, Hinspeter reprimanded her for spending too much time on a "no-access" job even though her male co-workers spent the same amount of time on that job without receiving any criticism.

The public criticism of Pucino persisted even after she filed a complaint with Verizon's internal Equal Employment Opportunity ("EEO") Hotline. Moore publicly announced to the Union Avenue Garage that Pucino had filed the complaint with the internal EEO Hotline. He then told workers that, because of Pucino's EEO complaint, "they are going to come into our garage, take over our garage. Every word is going to be scrutinized. You are going to be followed, and the garage will never be the same." Two days later, someone in the Union Avenue Garage placed a large dead snake in Pucino's work truck.

b) Procedural History

Pucino and Dauer filed Equal Employment Opportunity Commission ("EEOC") charges against Verizon on March 30, 2001 and the two filed suit on July 8, 2003 alleging gender discrimination in violation of 42 U.S.C. § 2000e ("Title VII") and the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL").[1]

_____

[1] Debora Cole, another female coworker, filed suit with Pucino and Dauer. The district court issued a separate order granting summary judgment to Verizon on Cole's claims and, like Dauer, Cole has not appealed.

8

The district court granted Verizon's motion for summary judgment. Dauer did not appeal. Pucino appeals only from the grant of summary judgment on her hostile workplace claim. We therefore limit our inquiry to that claim.

DISCUSSION

"We review a district court's grant of summary judgment de novo." See Beyer, 524 F.3d at 163. Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In deciding whether the district court erred, we must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Beyer, 524 F.3d at 163 (internal quotation marks omitted).

a) Title VII Hostile Work Environment Claim

In the present procedural context, Pucino's hostile work environment claim requires her to proffer sufficient evidence to allow a trier of fact to find disparate treatment based on gender, resulting in a hostile working environment that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)

9

(internal quotation marks omitted).[2]

## 1. "Based on Sex"

In assessing the "totality of the circumstances" offered to prove a hostile work environment, a fact-finder may consider only abusive conduct proven to be "based on sex." Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001).[3] This may be proven by "'harass[ment] in such sex-specific and derogatory terms . . . [as] to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace,'" Raniola, 243 F.3d at 621 (alteration in original) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)), or by offering "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." Alfano, 294 F.3d at 378. A plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based. See Raniola, 243 F.3d at 621-22; see also Howley v. Town of Stratford, 217 F.3d 141, 156 (2d Cir. 2000)

---

[2]We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

[3]Plaintiffs alleging discrimination based on sex must also provide "a specific basis . . . for imputing the objectionable conduct to the employer." Alfano, 294 F.3d at 373. Verizon does not dispute that Pucino could impute the alleged objectionable conduct of the two Verizon foremen to it.

(holding that a rational jury could infer that facially-neutral abuse was sex-based because perpetrator had previously made several sexually-derogatory statements).

Applying these standards, we conclude that Pucino has offered sufficient evidence to allow a trier of fact to find that the alleged abuse was indeed sex-based.

Pucino offered evidence showing that both Hinspeter and Moore subjected women to disparately harsh working conditions. These included the disparate assignment of work in dangerous areas and the refusal to provide assistance to female workers that was provided male co-workers. Verizon has proffered no evidence suggesting a legitimate non-discriminatory explanation for the foremen's conduct.

A trier of fact could also find disparate treatment based on gender in the provision or denial of tools and the use of bucket trucks. There was similar evidence with regard to access to public restrooms by male and female employees that would allow a trier of fact to conclude there was an attempt to force female employees to use restrooms that had no locks.

Pucino also offered evidence sufficient to allow a trier to find that Hinspeter and Moore engaged in verbal attacks on Pucino that were sex-based. In that regard, Pucino and the EEOC suggest that the word "bitch" is such an intensely degrading sexual epithet that its use implies as a matter of law hostility toward

11

women. It surely is the case that use of that word in many contexts reflects such hostility. However, we cannot say that use of the word "bitch" always and in every context has that meaning or that its usage need not be viewed in context. See Kriss v. Sprint Commc'ns Co., 58 F.3d 1276, 1281 (8th Cir. 1995); see also Yuknis v. First Student, Inc., 481 F.3d 552, 555 (7th Cir. 2007) ("[A] gender-specific term of abuse, such as 'son of a bitch,' need not imply hostility based on the abused person's sex any more than saying 'she is a bad worker' need imply hostility based on her sex.") (internal citation omitted). We also see no need to worry that a trier of fact cannot make the appropriate judgment about the word's use. We therefore reject a rule that would automatically command an inference of gender-based hostility to be drawn from its use.

Having said that, we also have no doubt that such a trier could find that Hinspeter's "constant" use of the word over several years in the context of the present record was sex-based and reflected hostility to women. See EEOC v. PVNF, L.L.C., 487 F.3d 790, 799 (10th Cir. 2007) ("[Defendant] frequently made indisputably gender-related remarks, and tolerated the use of the word 'bitch' to describe [plaintiff]. Under these circumstances, we think a jury should decide whether these comments were made because of gender animus.").

We also conclude that the combination of disparate treatment and gender-based verbal abuse here can support a further inference that the other complained-of instances of abuse involving the two foremen were in fact gender-based. "There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination -- for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." Alfano, 294 F.3d at 375. Here, even if incidents, such as the denial of overtime, did not directly amount to disparate treatment when considered alone in isolation, an inference that such conduct was gender-based could be drawn by a trier because Hinspeter and Moore were behind them. Notwithstanding the above analysis, Verizon argues that the evidence upon which Pucino relies is simply too conclusory to support an inference that the conduct in question was gender-based. We disagree. While "purely conclusory allegations of discrimination" that are devoid of "concrete particulars" do not suffice to avoid summary judgment, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), Pucino has proffered detailed evidence that Hinspeter and Moore treated similarly-situated male and female workers differently, including the accounts of others who witnessed such conduct. For that reason, we conclude that Pucino

13

has proffered evidence sufficient to show gender-based discrimination.

2. Objective & Subjective Hostility

We turn now to whether a rational juror could find that the gender-based conduct in question was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (internal quotation marks omitted). The relevant inquiry focuses on both objective and subjective hostility: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999). Relevant circumstances include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. In establishing this element, a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions. See Terry v. Ashcroft, 336 F.3d 128, 148-49 (2d Cir. 2003); see also Brennan, 192 F.3d at 318 ("[A] plaintiff must still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive, or that a single episode

14

is 'severe enough' to establish a hostile working environment.") (internal citation omitted). And again, in addressing this question, we consider the totality of circumstances. See Terry, 336 F.3d at 148-49.

The district court concluded that the challenged conduct amounted to nothing more than minor annoyances and inconveniences. Verizon once again argues that the record is simply too conclusory and lacking in concrete particulars to avoid summary judgment on the question of objective hostility. In particular, it argues that Pucino cannot establish the frequency of the abuse simply by stating in her affidavit that the alleged abuse occurred "constantly" or "frequently."

We disagree. We believe that a trier might easily find that the harassment and abuse was sufficiently severe to alter Pucino's working conditions. Work assignments, the provision of tools, the use of a bucket truck, the issues as to use of restrooms, and the verbal abuse affected most of the major aspects of Pucino's employment.

With regard to the conclusions of Pucino's evidence as to the frequency of the abuse, a plaintiff, to prevail, need not recount each and every instance of abuse to show pervasiveness. In Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997), a plaintiff testified that a supervisor "constantly harassed her -- so often that she 'lost count' -- but that she could recall the exact

dates and circumstances of only a few incidents of harassment." Id. at 631. In discussing the district court's grant of summary judgment, we explained that "If a jury were to credit [the plaintiff's] general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence of specific details about each incident." Id.; see also Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) (crediting testimony in support of a hostile work environment claim that plaintiff was "constantly" or "daily" made the victim of wanted physical contact); Brennan, 192 F.3d at 318 (explaining that "[a] plaintiff need not present a list of specific acts"). Pucino's evidence fits within the Torres precedent. She has described the nature of the alleged abuse in some detail. Although she omitted specifics as to the date and circumstances of each instance of abuse, her testimony was corroborated by other witnesses, including Dauer, Burton, and Irvin. We thus conclude that Pucino's evidence was sufficient to allow a trier to find pervasiveness.

Accordingly, we hold that a rational juror could find the treatment of Pucino to be sufficiently severe or sufficiently pervasive to alter the conditions of her employment.

CONCLUSION

We therefore vacate and remand for further proceedings consistent with this opinion.

16