In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3279

ANNA M. HALL,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-02114—**Joan Humphrey Lefkow**, *Judge*.

ARGUED FEBRUARY 15, 2013—DECIDED MARCH 29, 2013

Before FLAUM, WOOD, HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Anna Hall was a female plumber working in the House Drain Inspectors Division of Chicago's Department of Sewers, in which all other non-support staff employees were male. She alleges that her supervisor, Gregory Johnson, created a hostile work environment under Title VII. Hall argues that, because she was female, Johnson assigned her menial work, prohibited her coworkers from interacting with her, and

subjected her to verbal violence. The district court granted summary judgment after concluding Johnson's conduct was not hostile particularly in comparison to other employees' responsibilities. It also concluded that Hall failed to produce evidence that Johnson's conduct was because of her sex. We reverse as we conclude that a jury could infer Johnson's deliberate isolation of Hall was sufficiently pervasive to constitute a hostile work environment. On the much closer question of whether Hall's gender played a part in Johnson's actions, we determine that sufficient evidence to that effect can arguably be deduced from Johnson's comments.

## I. Background

### A. Factual Background

Although Hall has been a plumber for the City of Chicago since 1995, she was on full-time disability leave from 1999 to 2003 due to a work-related injury. As part of the City's return-to-work program, which the Department of Sewers implemented in 2003, Hall returned to the City's employ with the limitation that she could not lift over twenty-five pounds. Hall and the City agree this restriction precluded her from resuming work as a plumber, so Hall began working in the House Drain Inspectors Division of the Department. Gregory Johnson supervised the Division, which at the time was composed of thirteen male house drain inspectors and Tonya Cashew, Johnson's female secretary.

House drain inspectors primarily investigate piping that connects residential homes with the City's sewer

lines as part of the City's "private drain program," which aids property owners in repairing damage to the City's piping that affects residential plumbing. To determine property owners' eligibility for the program, the house drain inspectors run a video camera through the piping to observe whether the drainage problem is on the City's side of the system. Naturally, this video captures images of feces, feminine hygiene products, and other items flushed down toilets. When the inspectors return to the office, Johnson or another supervisor reviews the videos and confirms the inspectors' conclusions. Afterwards, the tapes remain on file at the office in case a resident or a member of the city council inquires about the Division's determination.

Hall's assignment to the House Drain Inspectors Division was a "light-duty" assignment because of her work restrictions. When she began in the Division, Johnson assigned her to alphabetize various files for several weeks. This work turned repetitive, not just because it was her only task, but because, according to Hall, Johnson gave her the same papers to sort over and over again. A few weeks later, Johnson gave Hall a box of the drainpipe videos. Hall inquired what Johnson wanted her do with them, to which Johnson responded: "You're a plumber. You figure it out." As she did with the papers, Hall began repetitively watching the videos. And although she claims she obediently took notes on what she observed, Hall testified no one ever reviewed her notes or accessed the videos she watched. One of the house drain inspectors, Thomas Cotton, testified that

Hall's "assignment . . . was like a non-assignment" and that she should have done office work rather than "sitting there watching videos that meant nothing to her." Another co-worker, Robert Owens, assumed the assignment was designed to "kill time."

Johnson claimed that Hall's notes aided him in responding to potential inquiries. He stated he gave Hall forms to complete and file in conjunction with this end, although the City never produced them. Moreover, in preparing for an auditor's review of the Department, Hall described her work more generously in a description she prepared, identifying her duties as "[r]eviewing private drain program videotapes through observation of tapes[;] [a] licensed plumber will interpret what should be placed on a daily inspection report, perusal by supervisor." However, Johnson admitted that he had already reviewed and taken his own notes on the tapes he gave Hall, making Hall's task duplicative.

After several dissatisfying weeks with her assignment, Hall told Johnson she thought she could provide more assistance by, for instance, accompanying drain inspectors on visits or explaining inspection procedures to homeowners. She eventually complained to Mary Jo Falcon, the Sewers Department's personnel director, who eventually scheduled a meeting on the subject. Falcon dismissed Hall's complaints, and in the process, called her a "trouble maker," referencing previous legal claims she made against the City. Hall continued reviewing videos until she left the Division in 2005, nearly two years after she arrived.

Meanwhile, in addition to her menial work, Johnson forbade the Division employees from speaking to or associating with Hall. Moreover, at a Division meeting just days after she started work, Johnson asked her to leave, and he ultimately excluded Hall from every meeting during her time in the Division. Cotton confirmed that Johnson made clear no one was to talk to Hall. Johnson justified severing contact with Hall because he feared the union would not approve of intermingling a plumber with house drain inspectors even though they belonged to the same union. He also used this reason to justify actively suppressing some of Hall's efforts to take on more responsibility in the Division. For instance, he once reprimanded Owens for reviewing blueprints with Hall. He also stated "if a person does something for so long, they can . . . request to be hired," and he did not want Hall "ever to be hired" as a house drain inspector. Despite his explanation, Johnson admitted no one ever told him that Hall was not to do house drain inspector work. In fact, his deposition testimony is apparently in tension with the union justification. He acknowledged that a plumber could learn to do house drain inspector work, and when he was asked why he forbade Owens from looking at the blueprints with Hall, he said "[n]o reason for it[;] [t]hat was an inspector's job."

The record reveals several situations in which Johnson allegedly directed anger towards Hall. First, Hall testified that on several occasions Johnson tried to "bump" her in the hall, succeeding one time and leading Hall to contact the police, her union, and her attorneys.

The bump only "touch[ed]" her; it did not knock her down and she continued to work. Hall also testified she heard Johnson discussing "cursing somebody out," and a coworker later told Hall that Johnson was referencing her. Hall thought Johnson made the statements knowing she was within earshot. Johnson also called Hall "stupid" and on another occasion raised his hand to her and yelled "get out."

Johnson was apparently friendly with the only other woman in the office, his secretary, but Johnson allegedly made a few gender-specific comments amid the animus directed at Hall. First, while watching The Jerry Springer Show, a somewhat-interesting workplace activity, Hall claimed Johnson called a female guest "a slut." Second, Hall stated she overheard Johnson say, in reference to Hall, that "[I] ought to slap that woman sitting out there," "I could slap that woman and get a promotion," and "[I] ought to go postal on that woman." Hall filed a complaint and talked to her union about these purported comments. Johnson denied all of these accusations, however, and testified that Hall was equally confrontational. Indeed, Johnson said he once reported her conduct to avoid communicating directly with Hall.

In January 2005, Hall filed a Violence in the Workplace report, which the Department's labor relations supervisor, John Zander, investigated. Zander subsequently transferred Hall eight days after the report and, after the investigation, reprimanded Johnson in writing.

**B. Procedural Background**

In late 2003, shortly after she joined the Division, Hall filed an internal complaint with the City and a charge with the Equal Employment Opportunity Commission ("EEOC") alleging Johnson had harassed and discriminated against her on the basis of her sex. She eventually filed this lawsuit in the Northern District of Illinois. Hall raised two claims concerning Johnson's conduct: he created a hostile work environment under Title VII and he was retaliating against her because she filed EEOC charges and an earlier unrelated lawsuit. In addition to the claims relating to Johnson's conduct, Hall also alleged the City discriminatorily denied her two promotions to "plumber in charge" positions by choosing male applicants and this, too, was in retaliation for her previous legal claims. The district court entered summary judgment against Hall. It concluded the claim for Johnson's retaliatory conduct was time barred, and there was insufficient evidence to support the hostile work environment and failure-to-promote claims. On appeal, Hall abandons all but the hostile work environment claim.

## II. Discussion

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII protects not just

tangible employment actions but also "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (internal quotations omitted). Consequently, the statute protects employees against a hostile work environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotations omitted).

To survive summary judgment, Hall must first produce evidence that the alleged harassment was severe or pervasive. This requirement is disjunctive—"one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts*." Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001). The hostility must be subjectively and objectively hostile. In other words, Hall must have actually felt harassed and that feeling must be reasonable. Second, Hall must show the hostile conditions were because of her sex. Title VII is not a general prophylactic against workplace animus. It is only concerned with animus motivated by certain protected characteristics. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Finally, there must be a basis for employer liability.

Summary judgment is appropriate when there is no genuine issue of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690-91

(7th Cir. 2010). Hall must produce sufficient admissible evidence, taken in the light most favorable to her, to return a jury verdict in her favor. *Id.* at 691. We review the district court's decision de novo.

### A. Johnson's Alleged Conduct Was Objectively and Subjectively Hostile

The thrust of Hall's claim is that from the day she started in the House Drain Inspectors Division, Johnson isolated her from her coworkers by assigning her unnecessary menial work and preventing others from interacting with her. Johnson compounded this isolation by sporadically intimidating and directing anger at her.

The City seeks to escape liability by arguing that none of Johnson's conduct, viewed in an individual context, was objectionable, carving out each alleged act of discrimination and explaining why it was neither severe nor pervasive. To an extent, we agree. We question whether any of Johnson's individual acts *alone* were sufficiently severe to constitute a hostile workplace under Title VII. Hall's principal focus, the videotape assignment, in isolation and over the course of her entire tenure, does not rise to the level needed to survive summary judgment. The work may have been unpleasant, boring, and unnecessary, but that can be said of much work. Data entry, for instance, requires forty-hour weeks of copying numbers into a database. The videos' subject matter is unremarkable given Hall's occupation and the role of her Division. Moreover, Johnson's decision to never use the videos is not overly problematic. Workers

are, on occasion, given "busy work," which lacks a strong purpose, designed solely to occupy them. The City also argues that Hall's banishment from meetings was reasonable in light of the purported intra-union politics. As for Johnson's comments, the City cites a slew of our cases for the principle that isolated comments (especially those, like the "slut" comment, not directed at the plaintiff) do not constitute a hostile work environment. *See, e.g., Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) ("The fact that one's coworkers do or say things that offend one, however deeply, does not amount to harassment if one is not within the target area of the offending comment."); *Russell v. Bd. of Trustees of the Univ. of Ill. at Chi.*, 243 F.3d 336, 344 (7th Cir. 2001); *see also Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002) (isolated incidents do not generally rise to hostile work environment).

This analysis, however, does not address our directive that "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000). Instead, a look at the totality of the circumstances must be had. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Under this approach, we conclude the alleged conduct was sufficient to establish a hostile work environment. Taking the facts in the light most favorable to Hall, a jury could conclude Johnson's conduct was designed to ostracize her from the rest of the Division. Her claim is that she reviewed useless videotapes, her colleagues were forbidden from speaking

to her, she was prohibited from Division meetings, her efforts to take on more work were suppressed, and Johnson subjected her to occasional verbal outbursts as well as one minor physical altercation.

Title VII, of course, does not provide a right to enjoyable work or to communicate with coworkers, but, according to the allegations, Johnson did more. It is suggested that he made Hall the Division pariah, undeserving of human interaction. The Civil Rights Act of 1964—passed in the wake of immense discrimination that, for example, required African Americans to use separate facilities—was plainly designed to prohibit a workplace in which an employee's daily treatment is made on the basis of a protected characteristic. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). In analyzing the first prong of Hall's claim—whether the alleged conduct was sufficiently severe or pervasive— we assume arguendo that she can establish that Johnson's actions were motivated by her sex (although this turns out to be a closer question). Cast in this light, a plaintiff that could show her boss prohibited coworker conversation because she was black would surely survive summary judgment. That is what Hall charges here, except she suggests sex discrimination in place of racial animus.

Previous cases are not overly helpful in resolving this highly fact-specific inquiry, but *Haugerud* does assist

Hall. In that case, a custodian and supervisor apparently conspired to force Haugerud, another custodian, from the coveted day shift at a local high school. *Haugerud*, 259 F.3d at 685. Among various acts specifically aimed at the plaintiff, evidence also showed that the school prohibited male custodians from assisting female custodians, only the female custodians were assigned the arduous task of snow removal, other males hid the plaintiff's tools, the only other female janitor left the school due to the hostility, and two supervisors made derogatory comments about their superiority to women. *Id.* at 694. We held that, while not severe, the plaintiff met her summary judgment burden by showing the defendants' systematic differential treatment of women interfered with her ability to perform her job. *Id.* Similarly, in *Pucino v. Verizon Wireless Communications*, the Second Circuit reversed summary judgment where the defendants had regularly assigned women to work in the dangerous areas of town, made them work alone, denied assistance requests from women but not men, and gave women more dangerous equipment. 618 F.3d 112, 118 (2d Cir. 2010). To be sure, these cases are stronger than Hall's. Unlike the plaintiffs in *Haugerud* and *Pucino*, Hall does not allege Johnson prevented her from completing her assigned tasks. Nor is Hall similarly situated to her co-workers (as she is a plumber, not a house drain inspector) like the plaintiffs in those cases, weakening an inference that Hall was discriminatorily assigned less favorable work. Importantly, though, these cases do suggest that incidents, which viewed in isolation seem relatively minor, that consistently or systematically burden women

throughout their employment are sufficiently pervasive to make out a hostile work environment claim.

As for the requirement of subjective harassment, we conclude that Hall has produced enough evidence to create an issue of fact. On several occasions, she reported Johnson's conduct to her supervisors, the EEOC, her union, and the police, all of which suggest she interpreted the acts as harassing. Plus, we have implied this burden is not high. *Haugerud*, 259 F.3d at 695 (The defendant "suggests that plaintiff should have to do more than declare that she was harassed, yet that is the whole point of the subjective inquiry: we inquire into whether the plaintiff perceived her environment to be hostile or abusive.").

### B. Hall Produced Enough Evidence of Sex Discrimination

Hall, however, must do more than show Johnson created a hostile work environment: the motive for the alleged mistreatment must be "sufficiently connected" to Hall's sex. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). We do not doubt Johnson harbored animus towards Hall, but we must review the record to determine whether Hall has produced enough evidence from which a jury could infer Johnson was motivated by Hall's gender. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) ("not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee" possesses a protected characteristic). Although this question is close, we conclude that she has.

First, Hall was the only female in the House Drain Inspectors Division besides Johnson's secretary. These employees have responsibilities and backgrounds similar to plumbers, and they are usually male. As such, the fact that Johnson's secretary was also female does not foreclose the inference that Hall's gender influenced Johnson's conduct: an actor may discriminate against only certain females such as those in traditionally male roles. Alice H. Eagly & Antonio Mladinic, *Are People Prejudiced Against Women? Some Answers from Research on Attitudes, Gender Stereotypes, and Judgments of Competence*, 5 Eur. Rev. Soc. Psychol. 1, 1 (1994) ("Although research on [attitudes and stereotypes] has not shown a pervasive tendency to devalue women's work, it has demonstrated prejudice against women in masculine domains (e.g. male-dominated jobs, male-stereotypic behavior)."). Indeed, this research suggests an employee's discrimination would manifest against Hall and not the secretary, as the latter is a position more identified with female stereotypes.

If a supervisor treated all women hostilely, we generally permit an inference that the actor was motivated by their gender. *See Oncale*, 523 U.S. at 80-81; *see, e.g.*, *Pucino*, 618 F.3d at 118; *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (reversing summary judgment because "Smith furnished affidavits . . . documenting [the harasser's] recurrent hostile behavior toward his female co-workers . . . . unmatched by similar reports of verbally and physically aggressive behavior toward male co-workers"). On the one hand, these cases seem to support Hall. She was the only female, and Johnson

allegedly made her workplace hostile. However, in these cases, the defendant subjected multiple women to the hostility. In other words, the only characteristic the women in those cases had in common was their gender, suggesting it motivated the defendant. Here, while Hall was the only female, she was also the only person who, for instance, was a plumber, not a house drain inspector, or who the City placed in Johnson's department through the return-to-work program. Thus, unlike the cited cases, where the existence of multiple victims permitted the jury to eliminate alternative explanations for the discriminatory acts, here we are left to speculate which among Hall's various traits and statuses led to Johnson's conduct.

Speculation is not enough. *See Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). True, Hall's status shows Johnson was possibly motivated by her gender, but every hostile work environment plaintiff will possess a protected characteristic. That coincidence alone does not provide an inference of sex discrimination. Otherwise, we would require Johnson to bear the burden of proving he was not motivated by gender.[1] *See Springer v. Durflinger*,

---

[1] Of course, under the *McDonnell Douglas* burden shifting framework, through which we analyze traditional discrimination claims that end in an adverse employment action, plaintiffs need only make out a prima face case that (1) they belong to a protected class; (2) their performance met the employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) similarly situated others not in the pro-

(continued...)

518 F.3d 479, 484 (7th Cir. 2008). Thus, Hall must also produce something more to suggest that, among the various explanations for Johnson's actions, he was motivated by gender. *See, e.g.*, *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095-96 (9th Cir. 2008) (reversing summary judgment in case where only female electrician was given more hazardous jobs and forbidden from certain meetings because the magistrate judge did not adequately consider comments like "this is a man's working world out here," "astrobitch," and "[w]e don't mind if females are working as long as they don't complain").

Accordingly, we look at Johnson's perceived aggression and determine if anything suggests a gender-discriminatory motive. For instance, had Johnson said "I'm going to make that 'bitch' do mindless work" or "no one can talk to that 'dumb woman,'" we would have little trouble finding a permissible inference that Johnson was motivated by gender. In those examples, the discriminatory acts are connected to comments evidencing gender animus. Here, although most of Johnson's conduct was devoid of gender-specific indicia, Johnson's alleged comment, in reference to Hall, that "he ought to slap that woman sitting out there" and "I could slap that woman and get a promotion" suggests

---

[1] (...continued)

tected class received more favorable treatment. *E.g.*, *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). Then, the defendant does bear the burden of providing a legitimate non-discriminatory reason for the action over which the plaintiff can create an issue of fact.

that perhaps some of Johnson's alleged animus stemmed from Hall's gender. This form of aggression is almost entirely limited to women—rarely does one say they are going to "slap" a male. To the extent any ambiguity remains, Johnson attached "that woman" to the end of the sentence, permitting a juror to conclude Hall's gender was one factor leading to the outburst. And because the totality of a defendant's conduct underlies a hostile work environment claim, a jury is free to conclude that an animus towards Hall's sex motivated all of his aggression if it infers Hall's gender caused this comment, which is one component of Johnson's alleged hostility.[2] *See Raniola v. Bratton*, 243 F.3d 610, 622 (2d Cir. 2001) ("We have held that prior derogatory comments . . . may permit an inference that further abusive treatment by the same person was motivated

_____

[2] In this regard, a hostile work environment claim is different than a typical Title VII claim, where we require contemporaneousness between the comment and action. *See, e.g.*, *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910-11 (7th Cir. 2001). The plaintiffs in those cases allege discrimination based on a single adverse employment action (usually a termination), and we generally conclude that if the comment came months before the action, nothing suggests the plaintiff's race or gender played a part in the speaker's decision. In hostile work environment claims, on the other hand, the plaintiff alleges a series of actions changed the conditions of her employment. Here, Johnson's comment was sufficiently connected (not to mention contemporaneous) with one component of her claim, an enraged outburst, permitting an inference that gender animus played a part in all of Johnson's conduct even though it remained mostly unspoken.

by the same sex-bias manifested in those earlier comments.").

In short, at this stage we take the facts and inferences in the light most favorable to Hall and conclude that this ambiguous, context-dependent comment could be viewed as evidencing gender animus, which in turn permits a jury to conclude that gender played a part in all of Johnson's actions. Additionally, ample evidence—such as the tension in Johnson's union explanation—allows a jury to reject Johnson's non-discriminatory justifications for his actions. As such, Hall has created an issue of fact that should be resolved at trial.

We believe the district court's error arose in the method through which it evaluated these comments. It correctly relied on our cases to conclude that the comments did not cross "the line that separates the merely vulgar and the mildly offensive from the deeply offensive and sexually harassing." *See Bakerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). However, this conclusion only relates to the first prong—whether the work environment was sufficiently severe or pervasive. We agree the comments do not make it objectively hostile. But, as explained above, we conclude that the isolation and occasional outbursts did satisfy that requirement. We view the comments, unlike the district court, in analyzing the second requirement of a hostile work environment claim—whether the alleged hostility was "because of sex"—and we conclude that they arguably connect Hall's gender to Johnson's conduct.

To be sure, Johnson's comments are quite different than gender-specific comments that do not evidence

gender animus. "I hate *her*" or "*she* drives me nuts," by definition, cannot apply to men. The list of other gender-specific comments that do not necessarily evidence harassment is endless: e.g., "that lady" or "every female." Where a comment crosses the line from gender specific to evidencing gender animus is blurry and depends on the factual context. "That woman needs to talk to her supervisor" is different than "that woman is undeserving of employment" (a discriminatory inference depends on why she is undeserving), which is different still than "I'm going to slap that woman." The permissible inferences could shift further depending on the speaker's conduct with other females, his history with whom the speech references, or a host of other factors. "When a word is ambiguous, context is everything." *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996). Thus, we even held "bitch," in certain contexts, might not show gender played a part in the employer's conduct. *Compare id.* (affirming summary judgment when supervisor called his former lover "sick bitch" because, as used, it was synonymous with "looney" and motivated by personal animus from the relationship), *with Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012) (affirming jury verdict in which defendant called employee "bitch," "stupid bitch," "f'n bitch" and treated other females poorly). Finally, to this end, a jury would remain free to conclude Johnson was not motivated by sex, because it believes, for instance, in this context "that woman" is indistinct from "she" or evidence at trial shows Johnson was actually predominantly upset that Hall was a poor worker.

**C. The City Is Vicariously Liable If Hall Succeeds**

Generally, an employer is liable for the hostile work environment created by a supervisor. *Faragher*, 524 U.S. at 807. However, unless a "tangible employment action is taken, a defending employer may raise an affirmative defense . . . . (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

Hall first argues that the affirmative defense does not apply because the hostile work environment "culminated" in a tangible employment action: "the reassignment to menial 'make work' reviewing of videotapes, i.e. reassignment with significantly different responsibilities." This argument fails because Hall's work assignment could not have been the culmination of anything— Johnson assigned the work at the outset of her time in the Division. Moreover, she was not "reassigned" to the role because she had not worked for the three years preceding her return to work.

The City, for its part, raises the affirmative defense, arguing that Hall was transferred within a week after she filed her Violence in the Workplace report and it issued Johnson a written reprimand after investigating Hall's allegations. The City additionally argues that Hall unreasonably waited a year to report Johnson's threatening statements.

The City's arguments, however, skew the record. Although the City reacted promptly to Hall's Violence in the Workplace report, the record also shows Hall first raised her concerns about her assignments a few weeks into her new position, not years later. This was met with dismissive allegations that Hall was a troublemaker, and Hall followed with her first EEOC charge. Moreover, Hall complained to the police and her union after the bumping incident, which occurred in February 2004. These measures, all of which preceded the Violence in the Workplace complaint, provided ample information from which a jury could conclude that Hall alerted the City to the perceived hostility and the City tardily responded only after the final complaint. This conclusion is bolstered by the City's failure to produce a codified sexual harassment policy with steps that Hall failed to follow in complaining about Johnson's conduct. *Id.* at 808 ("While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."). As such, we find Hall has also created a jury question on this final element of her claim.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's entry of summary judgment on Hall's hostile work environment claim and REMAND for further proceedings consistent with this opinion.