United States District Court
District of Puerto Rico

Francisco J. Reyes Caparrós

      v.
                                  Civil No. 15-cv-2229-JNL
                                  Opinion No. 2020 DNH 029

William P. Barr, Attorney General
of the United States

## **MEMORANDUM ORDER**

After a three-week trial, the jury returned a verdict in favor of plaintiff Francisco Reyes Caparrós on his single claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for retaliation through a hostile work environment, and awarded him $300,000 in damages[1] – the statutory maximum for employers with more than 500 employees. 42 U.S.C. § 1981a(b)(3). Reyes now seeks the court's judgment on whether he is entitled to equitable relief in addition to that award.

Because Reyes resigned from his employment with the United States Attorney's Office for the District of Puerto Rico ("USAO"), he may not recover either front pay or back pay unless he demonstrates that he was constructively discharged. As explained below, Reyes's failure to bring a separate constructive discharge claim precludes that recovery as a matter of law. And even if it did not, Reyes failed at trial to adduce evidence that satisfies the standard for demonstrating a constructive discharge.

---

[1] Jury Verdict (doc. no. 222).

Accordingly, the court denies Reyes's request for equitable remedies and awards him neither front pay nor back pay.

## I.     Applicable legal standard

Whether the plaintiff is entitled to recover equitable remedies on his claim under Title VII turns on a series of legal standards interconnected by the facts and history of his case.

### A.     Equitable remedies

Title VII limits the amount of compensatory damages available to Reyes, as a plaintiff prevailing on his retaliation claim, to $300,000.  42 U.S.C. § 1981a(b)(3)(D).  In addition to those compensatory damages, Reyes seeks equitable damages in the form of back pay and front pay.  Under Title VII of the Civil Rights Act, a court that

> finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint, . . . may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any *other equitable relief* as the court deems appropriate.

Id. § 2000e-5(g)(1) (emphasis added).  The "other equitable relief" provision of § 2000e-5(g)(1) authorizes both back pay and front pay.  Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 379 (1st Cir. 2004).

"An award of back pay compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment."  Johnson, 364 F.3d at 379.  Front pay, on the other hand, "compensates plaintiffs for lost wages that may accrue after the conclusion of the trial," that is, "'during the period between judgment and reinstatement

or in lieu of reinstatement.'" Id. (quoting Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 864 (2001)). "The availability of back pay and front pay is not affected by the cap on compensatory and punitive damages." Johnson, 364 F.3d at 378.

## B.    Constructive discharge

The parties agree that a plaintiff "must show either an actual or constructive discharge in order to receive the equitable remedy of reinstatement, or back and front pay in lieu of reinstatement." Hertzberg v. SRAM Corp., 261 F.3d 651, 659 (7th Cir. 2001). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Pa. State Police v. Suders, 542 U.S. 129, 141 (2004) (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 838–39 (3d ed. 1996)). A plaintiff who merely resigns "would not be entitled to recover damages for lost wages as he had a duty to remain on the job collecting his regular pay until relief from the [challenged] assignment was afforded by legal process." Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 120 (1977).

There is no dispute that the USAO did not overtly terminate Reyes's employment. Instead, Reyes contends that his February 3, 2015 resignation amounts to a constructive discharge, entitling him to the equitable relief he seeks. If Reyes does not (or cannot) demonstrate a constructive discharge, his "exclusive remedies are those set forth in 42 U.S.C. § 1981a," Hertzberg, 261 F.3d at 659, specifically, compensatory and punitive

3

damages, see 42 U.S.C. § 1981a(a), from which back pay and front pay are explicitly excluded, id. § 1981a(b)(2).

### C. Advisory verdict

At trial, the court sought and obtained an advisory verdict on whether Reyes was constructively discharged. "In an action not triable of right by a jury, the court, on motion or on its own may try any issue with an advisory jury . . . ." Fed. R. Civ. P. 39(c). A plaintiff is "not entitled to a jury trial under [his or her] Title VII equitable claims."[2] Ramos v. Roche Prod., Inc., 936 F.2d 43, 50 (1st Cir. 1991). Reyes's request for equitable relief stemmed from, and required a finding on, this unclaimed issue. So, this advisory verdict was, "as the name would suggest, purely advisory in nature; '[t]he responsibility for the decision-rendering process remains with the trial judge' and 'it is in its discretion whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury.'" United States v. Shields, 649 F.3d 78, 84 (1st Cir. 2011) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Proc. § 2335, at 354–56 (3d ed. 2008)).

---

[2] It is true that "[i]n this circuit, juries are generally entrusted with decisions on back pay when the jurors are already resolving issues of liability and compensatory damages." Johnson, 364 F.3d at 379–80. But in this case, neither party sought to put the issue of back pay before the jury. To the contrary, the defendant moved to exclude such evidence and argument from the jury's review. See Mot. in Limine (doc. no. 128). And Reyes conceded that he was not entitled to back pay as a legal remedy for his Title VII claim, consistently characterizing that relief as equitable. See, e.g., Plaintiff's Omnibus Obj. (doc. no. 148) at 18. Because the parties have consistently treated that relief as equitable and within the court's purview, the court granted the defendant's motion in limine and reserved the question of Reyes's entitlement thereto for post-trial proceedings. See Order on Mots. in Limine (doc. no. 168) at 31–33.

In doing so, the court "is not bound by the advisory verdict," Price v. Marshall Erdman & Assocs., Inc., 966 F.2d 320, 324 (7th Cir. 1992), but instead "has an independent decision-making responsibility," Town of Wolfeboro v. Wright-Pierce, Inc., No. 12-cv-130, 2014 WL 1976629, at *1 (D.N.H. May 15, 2014) (DiClerico, J.). "In an action tried on the facts . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Reyes's claim for equitable remedies ultimately turns on whether the court accepts the advisory verdict on constructive discharge.

## II.    Background

The court recounted the background and history of this action extensively in its order on the defendant's motion for judgment as a matter of law and a new trial.[3] The only question remaining is whether Reyes proved a constructive discharge, entitling him to equitable relief. The court therefore recites here only those facts relevant to Reyes's alleged constructive discharge and his requested equitable relief.

### A.    Initiation of Reyes's retaliation claim

Reyes was employed by the USAO for the District of Puerto Rico as an Intelligence Specialist for almost six years, from May 24, 2009 until he resigned on February 3, 2015.[4] In February 2012, he obtained a ballistic vest for an Assistant United

---

[3] See Revised Rule 50 Order (doc. no. 265) at 5–19.

[4] Stipulated Facts (doc. no. 194) ¶ 1.

States Attorney ("AUSA"). A few days later, he was called into a management-related meeting led by United States Attorney Rosa Emilia Rodríguez and attended by First Assistant United States Attorney ("FAUSA") Maria Domínguez and AUSA Jose Capo. Reyes testified that during that meeting, he was chastised for providing the ballistic vest to that AUSA and told that he was "helping her become a victim" and needed to "know who the crazies in the office are."[5] He testified that, after the meeting, FAUSA Domínguez informed him that "there is a complaint" against the office and that giving her a ballistics vest "would make her look like a victim."[6] Reyes reportedly responded that failing to investigate or provide the vest would be discriminatory against the complainant AUSA, who had an employment claim pending against the USAO, though Reyes admitted he was unaware of that complaint before this conversation.

This, Reyes alleged, was the beginning of retaliatory conduct against him. Specifically, he alleged that his supervisors, including U.S. Attorney Rodríguez and FAUSA Domínguez, perceived his actions as supporting that employment complaint and subsequently retaliated against him as a result of that perception by creating a hostile work environment. After that meeting, Reyes testified, he "fell from grace" and had a "target on his back,"[7] resulting in three years of retaliatory actions culminating with his

---

[5] May 23, 2018 Tr. (doc. no. 255) at 94–95; May 29, 2018 Tr. (doc. no. 256) at 98–99.

[6] May 23, 2018 Tr. (doc. no. 255) at 96; May 29, 2018 Tr. (doc. no. 256) at 98–99. FAUSA Domínguez testified that she held no such conversation with Reyes. May 21, 2018 Tr. (doc. no. 253) at 167.

[7] May 23, 2018 Tr. (doc. no. 255) at 161; May 29, 2018 Tr. (doc. no. 256) at 69.

resignation on February 3, 2015.[8]  Those actions, he contended, included micromanagement, reassignment, relocation of his office, a series of undeserved reprimands, and investigations into his conduct by both the FBI and the Department of Justice's Office of the Inspector General ("OIG").

Reyes filed an administrative complaint with the Department of Justice's Equal Employment Opportunity ("EEO") staff on November 29, 2013, alleging that some of these actions constituted retaliation against him for his protected activity in obtaining a ballistic vest for the AUSA in February 2012.  On November 28, 2014, he filed a second EEO complaint, alleging that his supervisors further retaliated against him for filing his first EEO complaint by suspending or reprimanding him, unnecessarily editing his work, again moving his office, and requiring him to document a medical appointment.

After 16 months of working alternative duties, Reyes requested reinstatement of his duties as an Intelligence Specialist on January 22, 2015.[9]  When U.S. Attorney Rodríguez declined to do so, Reyes resigned on February 3, 2015.  In his resignation letter, he identified several of the incidents described above as leading to his decision, including what he described as the "unfounded" FBI and OIG investigations.

---

[8] The court summarizes those actions here and addresses them in greater detail infra Part III.B.2.

[9] Trial Ex. 115 at D2028.

## B. Constructive discharge in this action

In this case, as mentioned supra, Reyes filed this lawsuit, bringing one claim for retaliation under Title VII through creation of a hostile work environment.[10] He expressly disavowed any other claims early in the litigation.[11] During summary judgment proceedings, the court expressed its understanding that "there's only one claim here, Title VII discrimination," and that "constructive discharge [was] only part of this case as simply part of the allegation of retaliatory conduct and adverse work action."[12] Reyes's counsel did not dispute this characterization, and has not done so during the post-trial briefing on this request for equity-based back pay or front pay.

Because Reyes's requests for equitable relief would turn on whether he was, in fact, constructively discharged, the court permitted the jury to render an advisory verdict on that question. The court therefore instructed the jury on the elements of constructive discharge and included an advisory verdict on the verdict form, over the defendant's objection. In addition to finding that Reyes's supervisors at the USAO retaliated against him for engaging in protected activity and awarding him the statutory maximum of

---

[10] Compl. (doc. no. 1) ¶¶ 19.2, 19.4.

[11] See Plaintiff's Obj. to Mot. to Dismiss (doc. no. 25) at 6 ("Plaintiff's sole cause of action is for discrimination and retaliation under Title VII . . . .").

[12] Summ. J. Hrg. Tr. (doc. no. 119) at 16.

$300,000 in compensatory damages,[13] the jury gave an advisory verdict finding that Reyes had been constructively discharged.[14]

In moving for a new trial, the defendant raised the constructive discharge issue. Specifically, the USAO argued that permitting the advisory verdict at the end of trial, after evidence, unfairly surprised it by reversing a pretrial motion in limine order.[15] Before trial, the court had granted the defendant's motion in limine to exclude "the plaintiff's argument that he is entitled to recover back pay and front pay, and any evidence supporting such claims." It left open the possibility of further briefing and argument on the availability of those remedies and, if available, a post-trial evidentiary hearing on the amount to which Reyes may be entitled.[16] As the court explained in its Rule 50 order, nothing in that pretrial order precluded evidence about constructive discharge, and the defendant had been on notice since at least the summary judgment hearing that the circumstances of Reyes's departure from the USAO were relevant to his Title VII claim.[17] Addressing the USAO's claims of prejudice, the court in that order further explained that it had "reserved the question of" the availability of equitable damages "for post-trial briefing" and that, "should it conclude that Reyes may in fact

---

[13] Verdict (doc. no. 222) at 2–3.

[14] Id. at 4.

[15] See Defendant's Rule 50 Mem. (doc. no. 237) at 14–16.

[16] Order on Mots. in Limine (doc. no. 168) at 31–33.

[17] Rule 50 Order (doc. no. 265) at 44–47.

9

pursue them, the question of his entitlement to them" would be the subject of "a post-trial hearing during which both sides would be permitted to present evidence to the court."[18]

### C. Constructive discharge briefing

After denying the defendant's Rule 50 motion, the court sought briefing, first, on whether front pay and back pay were available to Reyes as a legal matter under Title VII.[19] After reviewing those memoranda, the court held a telephone conference with counsel for both parties on December 20, 2019. During that conference, the plaintiff, representing that he put on all evidence concerning constructive discharge at trial, objected to the court hearing any further evidence about the availability of equitable damages and contended that any future hearing on the issue be limited to the amount of such damages, if any, to which he is entitled.[20] The defendant, on the other hand, argued that the trial evidence failed to support the jury's advisory verdict and continues to seek to introduce additional evidence on that issue before any decision that Reyes is entitled to the equitable damages that he seeks.[21]

The court accordingly ordered the parties to "submit memoranda addressing whether the evidence produced during the three-week trial on the plaintiff's hostile work

---

[18] Id. at 48, 50–51. As explained infra Part II.C., Reyes eventually objected to the court taking any further evidence regarding constructive discharge.

[19] Procedural Order of August 16, 2019 (doc. no. 266).

[20] Order of December 26, 2019 (doc. no. 280) at 1.

[21] Id.

environment claim supports a finding that the plaintiff was constructively discharged from his employment," and to "support their arguments with specific citations to the trial record."[22]  The court requested this briefing because, unless Reyes carried his burden of demonstrating a constructive discharge based on the evidence presented at trial, the court need not expend its or the parties' resources on a hearing to calculate equitable damages to which Reyes would not be entitled.  Reyes agreed to this procedure during the December 20, 2019 telephone conference.[23]

## III.   Analysis

In order to obtain either back pay or front pay, Reyes must have been discharged from his employment.  Hertzberg, 261 F.3d at 659.  The parties agree, and the evidence is clear, that Reyes was not fired from his position at the USAO or otherwise overtly terminated by the USAO.  Instead, the parties agree that Reyes resigned on February 3, 2015.[24]  Reyes contends that his resignation constituted a constructive discharge, entitling him to equitable relief in the form of back pay and front pay.

The court rejects this contention and declines to adopt the jury's advisory verdict finding that Reyes had proven constructive discharge.  First, as a matter of law, a factual finding of constructive discharge absent a separate claim for relief on those grounds does not entitle Reyes to equitable relief.  And here, Reyes expressly disclaimed any separate

---

[22] Id. at 1–2.

[23] See id.

[24] Stipulated Facts (doc. no. 194) ¶ 1.

11

constructive discharge claim in this litigation. Second, even if the law allowed Reyes such recovery without pleading a constructive discharge claim, Reyes did not carry his burden at trial of proving that his resignation constituted a constructive discharge. As a result, Reyes is not entitled to equitable damages on his Title VII claim.

### A. Effect of no constructive discharge claim

"[C]onstructive discharge is a claim distinct from the underlying discriminatory act" of a Title VII claim. Green v. Brennan, 136 S. Ct. 1769, 1779 (2016) (citing Suders, 542 U.S. at 149). "For an atmosphere of . . . hostility to be actionable" as a discriminatory or retaliatory act under Title VII, "the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Suders, 542 U.S. at 146–47 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). But a plaintiff who claims that a hostile work environment caused his constructive discharge must show "something more" than merely that the work environment was hostile. Id. at 147. "A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Id. In this manner, a hostile work environment is also a "lesser included component" of a separate "hostile-environment constructive discharge" claim. Id. at 150.

In Suders, the Court explained that "[u]nder the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Id. at 141. More recently,

however, the Court has rejected the idea that "the constructive-discharge doctrine merely allows a plaintiff to expand any underlying discrimination claim to include the damages from leaving his job, thereby increasing his available remedies." Green, 136 S. Ct. at 1779. Such a "sometimes-a-claim-sometimes-not theory of constructive discharge" would be "novel and contrary to the constructive discharge doctrine." Id. As a result, resignation is "an essential part of [the plaintiff's] constructive discharge claim," and not merely an action expanding a plaintiff's remedies for other claims. Id. at 1780.

Along this line, some appellate courts hold that a resigning plaintiff must succeed on a separate claim for constructive discharge in these circumstances before the plaintiff can obtain equitable damages on a hostile work environment or discrimination theory under Title VII. For example, the Third Circuit Court of Appeals has held "that a successful hostile work environment claim alone, without a successful constructive discharge claim, is insufficient to support a back pay award." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 (3d Cir. 2006). Other courts have echoed this conclusion. E.g., Hertzberg, 261 F.3d at 661 (concluding that, even if the plaintiff "may well have convinced a jury that she had been constructively discharge," failure to pursue a constructive discharge claim precluded lost wages award); Mallinson–Montague v. Pocrnick, 224 F.3d 1224, 1236–37 (10th Cir. 2000) ("[T]he equitable remedy of back pay is only available under § 2000e–5(g) when the plaintiff has demonstrated that she was constructively discharged," and when jury rejected their constructive discharge claim, the plaintiffs "were not entitled to back or front pay."); Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1219 (8th Cir. 1997) (rejecting an appellant's characterization of her

13

award on her claim of sexual harassment as "back pay" because she neither brought nor proved a constructive discharge claim).

The plaintiff has offered, and this court has found, no decision from the First Circuit Court of Appeals in which a back pay or front pay award under Title VII (or related statutes) was allowed to stand absent either an actual discharge or a claim for constructive discharge. Nor has the plaintiff provided, or the court located, any authority permitting such an outcome from any other Court of Appeals.

Here, it is undisputed that Reyes brought a single claim under Title VII: retaliation through creation of a hostile work environment. Reyes has expressly disclaimed any separate claim for constructive discharge throughout this litigation.[25] Because Reyes cannot recover the equitable damages that he seeks without such a claim, those damages are unavailable to him here as a matter of law.

## B.     Reyes has not proven constructive discharge

Even assuming that Reyes had brought such a claim, the trial evidence does not support, and the court therefore declines to adopt, the jury's advisory verdict that Reyes was constructively discharged from his employment at the USAO.

---

[25] See Plaintiff's Obj. to Mot. to Dismiss (doc. no. 25) at 6 ("Plaintiff's sole cause of action is for discrimination and retaliation under Title VII . . . ."); Summ. J. Hrg. Tr. (doc. no. 119) at 15–16 ("[A]t the motion to dismiss litigation Attorney Lopez-Ortiz was very clear that she had one claim here under Title VII. There wasn't a sort of separate wrongful discharge claim under common law or anything else. And if you review the causes of action on page 32 of the complaint and the prayer for relief on 33, there's no specific allegation of a termination claim or wrongful discharge claim or constructive discharge . . . .").

14

### 1. Legal standard

As explained supra, "[a] plaintiff who advances" a claim for constructive discharge through a hostile work environment "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Suders, 542 U.S. at 146–47. This is a higher standard than that necessary for a finding of liability on a hostile work environment claim, which requires only that the employer's offending behavior was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. The standard is objective, id. at 141, and "cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).

"In order to establish constructive discharge," a plaintiff "must show that conditions were so intolerable that they rendered a seemingly voluntary resignation a termination." Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008). The question in such cases "is not whether working conditions at the facility were difficult or unpleasant." Id. (quoting Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004)). An employee instead "must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." Id. Accordingly, "reassignment with significantly diminished job responsibilities, or a decision causing a significant change in benefits," can constitute a constructive discharge, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998), but "a reduction in responsibility or a change in the way business is done, unaccompanied by

a diminution in salary or some other marked lessening of the quality of working conditions, does not," Suárez, 229 F.3d at 55.

Despite Reyes's unsupported assertion that "the burden still remains with the Defendant to identify the evidence that is lacking and its relevance,"[26] it is Reyes who, as the plaintiff, has the burden of proving constructive discharge. See Torrech-Hernández, 519 F.3d at 50. The advisory verdict on the matter has no legal effect, which means that Reyes has not yet carried that burden. Harris v. Sec'y, U.S. Dep't of the Army, 119 F.3d 1313, 1320 (8th Cir. 1997) ("When a district court submits a claim to an advisory jury, the court is free to accept or reject the jury's advisory verdict in making its own findings," and the Court of Appeals "reviews the district court's findings for clear error as if there had been no jury."). Accordingly, the burden remains on Reyes to demonstrate, through the evidence adduced at trial, that his resignation constituted a constructive discharge.

### 2. Reyes's trial evidence

Reyes based his hostile work environment retaliation claim on a series of actions taken by his supervisors beginning in February 2012. At trial, he introduced the following evidence – largely through his own testimony, but also through that of U.S. Attorney Rodríguez and others – in support of his claim for retaliation through a

---

[26] Plaintiff's Mem. on Evid. (doc. no. 282) ¶ 10.

16

hostile work environment.  In arguing that he was constructively discharged, he relies on the same series of events.[27]

In February 2012, three years before he resigned, Reyes provided a ballistic vest to an AUSA that, he testified, the USAO management team viewed with disfavor.[28]  After Reyes provided the vest, he was called into a management meeting and lectured by both U.S. Attorney Rodríguez and FAUSA Domínguez.[29]  Following that incident, Reyes claimed his supervisors turned on him and began to retaliate by creating a hostile work environment that culminated in his resignation three full years later, on February 3, 2015.

He testified that he received greater oversight – "micro-management" – beginning in early 2012, after that meeting occurred.[30]  He was moved from an office near U.S. Attorney Rodríguez's on the 16th floor to one closer to his immediate supervisor, Lisa Western, on the 14h floor, during the same 2012 timeframe.[31]

He received a written reprimand for posting an inappropriate image mocking a workplace security guard in May 2013, almost two years before his resignation.[32]  Four months later, U.S. Attorney Rodríguez called Reyes "the one no one likes in the office"

---

[27] See Plaintiff's Mem. on Evid. (doc. no. 282) ¶ 8; Plaintiff's Response on Evid. (doc. no. 284) at 3–7.

[28] May 23, 2018 Tr. (doc. no. 255) at 93–96.

[29] Id. at 92–99.

[30] Id. at 113–114; Trial Ex. 25.

[31] May 23, 2018 Tr. (doc. no. 255) at 83, 85.

[32] Id. at 118, 120.

during a full staff meeting,[33] though she testified that she did so in a joking manner, in light of Reyes's general popularity around the office.[34]  That October, the FBI began to investigate Reyes[35] after he sought permission to attend a cultural program in Russia[36] hosted by someone the FBI had identified as a potential Russian spy.[37]

As part of that investigation, the FBI restricted Reyes from "FBI space" and asked the USAO to "refrain from disseminating to [him] the contents of any information and/or documents related to FBI criminal or national security investigative matters, until further notice."[38]  As a result of that restriction, Reyes was furloughed during the government shutdown in 2013.[39]  Upon his return in October, he was assigned the duties of a paralegal and his access to his office was limited.[40]  Reyes filed his first EEO complaint alleging retaliation shortly thereafter in November 2013, a full 15 months before he resigned.[41]

---

[33] Id. at 131.

[34] Id. at 7–8.

[35] May 22, 2018 Tr. (doc. no. 254) at 166–68; 170–171.

[36] May 23, 2018 Tr. (doc. no. 255) at 124–126; Trial Ex. 27.

[37] May 30, 2018 Tr. (doc. no. 257) at 53–57.

[38] Trial Ex. 33; May 30, 2018 Tr. (doc. no. 257) at 57–59.  Reyes was not at that time, or any time until he sought reinstatement of his intelligence specialist duties, informed that an FBI investigation or limitation was the reason for his reassignment.  He was told he was reassigned merely "until things get resolved."  See May 23, 2018 Tr. (doc. no. 255) at 134–35.

[39] May 23, 2018 Tr. (doc. no. 255) at 136–37.

[40] Id. at 137–38.

[41] Id. at 140; Trial Ex. 64.

The OIG also opened an investigation into Reyes on the same basis. During that investigation, in June 2014, he was questioned about the invitation to the Russian cultural event as well as about a socialism-related PowerPoint presentation found on his computer.[42] In his resignation letter, Reyes cited a lack of investigation into the source of that file – which was not his, despite its presence on his computer – as a reason for his departure.[43] But Reyes testified that he, himself, had uncovered the source of those documents with minimal effort and explained that source to his supervisors.[44]

During the 2013–2014 timeframe, while the FBI and OIG investigations were pending, Reyes was assigned paralegal duties in the Civil and Appellate Divisions of the USAO. He received a half-day suspension in March 2014, almost a year before his resignation, for lack of candor and negligent performance of an assignment to collect and present statistics related to firearms cases prosecuted by the USAO.[45] His office was moved to the 14th floor during that assignment.[46] In July 2014, he prepared a memorandum for the chief of the Appellate Division which, he testified, Second Assistant to the United States Attorney ("SAUSA") Jacqueline Novas excessively edited

---

[42] May 23, 2018 Tr. (doc. no. 255) at 154.

[43] See Trial Ex. 117.

[44] May 23, 2018 Tr. (doc. no. 255) at 155–56; Trial Ex. 89.

[45] May 23, 2018 Tr. (doc. no. 255) at 151–52.

[46] Id. at 153.

as a form of retaliation.[47] At some point thereafter, he was moved to the wing of the USAO that handled Social Security fraud cases.[48] This office was located in a different building from his previous office.[49]

On August 15, 2014, six months before his resignation, Reyes was again reprimanded,[50] this time for conduct unbecoming a federal employee – specifically, gossiping – after Reyes discussed with a coworker the fact that Reyes had filed a Freedom of Information Act request seeking information about past credit card use by two AUSAs who had allegedly conducted an affair.[51] Finally, he was asked for a doctor's note to justify a full day's leave for a medical appointment in early October 2014, after a picture of Reyes on the beach in Florida that same day appeared on the social media platform, Facebook.[52]

On January 22, 2015, Reyes requested that U.S. Attorney Rodríguez reinstate his duties as an Intelligence Specialist.[53] She responded that she could not "allow [him] to resume those responsibilities at this time as [she was] still in the process of determining

---

[47] May 22, 2018 Tr. (doc. no. 254) at 101–02; May 23, 2018 Tr. (doc. no. 255) at 177–78.

[48] Id. at 179.

[49] Id. at 169.

[50] Id. at 159–60.

[51] Id. at 170–71. In his resignation letter, Reyes cited one AUSA sharing information about his FOIA request with others as a basis for his departure. See Trial Ex. 117.

[52] May 21, 2018 Tr. (doc. no. 253) at 25–27; May 22, 2018 Tr. (doc. no. 254) at 35–37; May 23, 2018 Tr. (doc. no. 255) at 181–82.

[53] Trial Ex. 116 at D2028.

20

whether [he could] perform the full range of duties" required of an Intelligence Specialist.[54] Though she did not tell Reyes as much, the FBI had not yet concluded its investigation or lifted its prohibition.[55] Reyes submitted his letter of resignation to U.S. Attorney Rodríguez about one week later, on February 3, 2015.[56]

### 3.    Analysis

When given the opportunity to identify the trial evidence that supported a finding of constructive discharge, Reyes argued that "EVERYTHING [sic] presented at trial" supports his constructive discharge because that "finding is part of the retaliatory hostile work environment claim" and is thus "supported by the same evidence the jury considered for its verdict."[57] While true that Reyes must rely here on the same evidence that he presented at trial, the converse – that all evidence presented at trial is relevant to a constructive discharge – does not hold. To the contrary, <u>most</u> if not all, of the evidence

---

[54] <u>Id.</u> at D2029.

[55] May 22, 2018 Tr. (doc. no. 254) at 194–98. The investigation concluded in December 2015. May 30, 2018 Tr. (doc. no. 257) at 60.

[56] Trial Ex. 117.

[57] Plaintiff's Mem. on Evid. (doc. no. 282) ¶ 8. As a result, Reyes explains, though he "and his counsel have made an exhaustive good faith effort to comply with the Court's directive" to explain what trial evidence supported a constructive discharge, it eventually became "clear that to brief the evidence in support of the constructive discharge would require a full and thorough discussion of the totality of the evidence presented at trial, a task that is evidently inconsistent with the 25 page limit set by the Court." <u>Id.</u> ¶ 9. Instead of asking for additional pages, Reyes, decided not to cite to the trial record at all. He remedied this oversight to a degree in his substantially shorter responsive memorandum, in which he outlined, with at least some citations to his own testimony, the series of events leading to his resignation. <u>See</u> Plaintiff's Response on Evid. (doc. no. 284) at 3–6.

fails to establish that a constructive discharge occurred. So, even crediting Reyes's evidence concerning these events — evidence that did not go undisputed — the conduct of which Reyes complains does not turn his resignation into a constructive discharge.

Most of the actions on which Reyes based his retaliation claim occurred too remote in time from his resignation to constitute a basis for constructive discharge. "[I]f a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged." Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000). In Landrau-Romero, the Court of Appeals concluded that a plaintiff's resignation seven months after alleged harassment "came too late after the offensive conduct to be labeled a constructive discharge." Id. Six months between alleged harassment and a plaintiff's resignation has also precluded a constructive discharge finding. See Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991).

Here, the conduct that Reyes claims created a hostile work environment began in early 2012 and occurred over the course of three years. Even taking all of it together as a continuous course of retaliatory action, Reyes waited three years after the retaliation began, and four months after the final act of alleged retaliation – the October 2014 request for a doctor's note[58] – before he resigned. Given the extensive amount of time that Reyes remained both employed and allegedly subject to retaliation, the conditions under which he operated were not "so intolerable that they rendered a seemingly

---

[58] May 23, 2018 Tr. (doc. no. 255) at 181–82; May 22, 2018 Tr. (doc. no. 254) at 35–37.

voluntary resignation a termination." Torrech-Hernández, 519 F.3d at 50.  Because he did "not resign within a reasonable time period after the alleged harassment, he was not constructively discharged."  Landrau-Romero, 212 F.3d at 613.

Reyes further argues that he resigned because U.S. Attorney Rodríguez refused to reinstate his Intelligence Specialist duties at the conclusion of the OIG investigation.[59] He argues that the grounds of her refusal to reinstate him – that the management team was still in the process of determining whether he could perform those duties – were "a pretext to keep Francisco away, publicly chastened, exiled at the Social Security offices . . . ."[60]  First, the evidence does not support this argument.  Performing his duties as an intelligence specialist required Reyes to interface with the FBI.[61]  As explained supra, though Reyes may not have known it, the FBI's investigation and its limitations on his access were still ongoing as of his request for reinstatement.[62]  No evidence supports Reyes's proposition that his supervisors fabricated those limitations or imposed them specifically to preclude him from engaging in his duties as an intelligence specialist.

But even were those reasons a pretext, which they do not appear to have been, the actions taken against Reyes – investigations by other entities within the Department of

[59] See Plaintiff's Response on Evid. (doc. no. 284) at 6.

[60] Id.

[61] See May 23, 2018 Tr. (doc. no. 255) at 113, 116–17; May 29, 2018, Tr. (doc. no. 256) at 5, 7-8,

[62] See May 22, 2018 Tr. (doc. no. 254) at 166–70, 194–95; May 30, 2018 Tr. (doc. no. 257) at 60.

Justice, an ongoing change in his duties, and an office located in a separate but nearby building – do not rise to the level of a constructive discharge. Presented with similar circumstances, the First Circuit Court of Appeals concluded that a change in title, reassignment to other duties, and relocation, even added to a reduction in an employee's bonus, did not "establish that [his] working conditions become so intolerable that a reasonable person in [his] place would feel forced to resign[.]" Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 25 (1st Cir. 2013). In the standard-setting case itself, "the claim of constructive discharge was rejected precisely because the employee had not left his employment, but continued to work and draw his full salary on the less desirable 1:00 a.m. shift to which he had been transferred." Pedro-Cos v. Contreras, 976 F.2d 83, 85 (1st Cir. 1992) (citing Newspaper Guild v. Boston Herald–Traveler Corp., 238 F.2d 471, 472 (1st Cir. 1956)). Here, Reyes's duties and office location changed, but he retained the same title, position, and salary throughout the three years of the alleged retaliation.[63] He performed those alternative duties, continuing his employment in what he claimed to be a hostile work environment, for a full 16 months before deciding to resign. Neither the shift in his duties nor the refusal to reinstate them rises to the level of effectively forcing Reyes to resign.

Reyes also testified that, by February 2015, he felt that he had to resign because "the alternative[] [was to] stay there and get sick and get crazy."[64] But Reyes's subjective

---

[63] Stipulated Facts (doc. no. 194) ¶¶ 2, 15.

[64] May 23, 2018 Tr. (doc. no. 255) at 195.

beliefs about what the future held have no bearing on this analysis. The objective

constructive discharge standard "cannot be triggered solely by an employee's subjective

beliefs, no matter how sincerely held." Suárez, 229 F.3d at 54.

As the defendant observes, Reyes testified that "he had been planning [his]

resignation for some time" before he finally submitted it on February 3, 2015.[65] He

graduated from law school in 2013, took and passed the bar exam in September of that

year,[66] and was sworn into the bar in March 2014.[67] In the months leading up to his

resignation, he testified, he was considering a career as a lawyer, was "looking for

vacancies," and had discussions with an attorney in Florida about joining his practice.[68]

He "started looking for jobs in October" of 2014.[69]

The fact that Reyes was already looking for other employment opportunities for at

least four months before his resignation does not, in and of itself, prove that "his

employer . . . allow[ed] him the opportunity to make a free choice regarding his

employment relationship." Torrech-Hernández, 519 F.3d at 50–51. But, adding this to

"the totality of the facts," Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732 (1st Cir.

1999), it tends to suggest that Reyes was in the process of "mak[ing] a free choice

---

[65] May 29, 2018 Tr. (doc. no. 256) at 83.

[66] May 23, 2018 Tr. (doc. no. 255) at 58–59.

[67] Id. at 190.

[68] May 29, 2018 Tr. (doc. no. 256) at 83.

[69] Id. at 83–84.

regarding his employment relationship" when he resigned. Torrech-Hernández, 519 F.3d at 50–51. And constructive discharge requires proof of his employer's denial of that opportunity. Id. ("[I]n order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will.").

In short, the behavior of which Reyes complained did not rise to the level of a constructive discharge, as measured against the applicable objective standard. The fact that Reyes did not resign for almost three years after he claims that behavior began, for over a year after his duties were reassigned, and for four months after the last of the incidents that he alleges constituted a hostile work environment, precludes the conclusion that his working conditions were "so intolerable that a reasonable person in [his] place would feel forced to resign[.]" Gerald, 707 F.3d at 25.

### 4. Jury verdict

Reyes argues that the court cannot separate the jury's advisory verdict on constructive discharge from its verdict on his retaliation claim. Specifically, he contends that the defendant's position that Reyes has not met his burden on constructive discharge "is actually another improper request for the Court to revise the jury's finding on Title VII retaliation"[70] because "[t]he Court's denial of Defendant's post-trial motion [for a new trial] is sufficient verification of the sufficiency of the evidence presented at trial to

---

[70] Plaintiff's Mem. on Evid. (doc. no. 282) ¶ 8.

uphold the jury's verdict on retaliation, and, consequently, of constructive discharge."[71] This is not the case.

Simply put, this argument impermissibly (and illogically) conflates the jury's Title VII verdict, its advisory constructive discharge verdict, and the court's denial of the defendant's new trial motion. To conclude that the defendant was liable under Title VII for creating a retaliatory hostile work environment, the jury need only have found that the behavior of Reyes's supervisors was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Suders, 542 U.S. at 146–47. Working conditions can be altered – even abusive – without reaching the level of being "so intolerable that a reasonable person would have felt compelled to resign." Id. The mere fact that the jury found for Reyes on his retaliation claim does not, therefore, mandate the conclusion that Reyes proved constructive discharge. And as discussed supra, he has not.

## IV. Conclusion

Because Reyes resigned from his position at the USAO, he may not obtain the equitable remedies of front pay or back pay under Title VII absent a separate claim for constructive discharge, which he expressly disclaimed. Even had he brought such a claim, the trial evidence would not support it. Accordingly, the court declines to adopt the jury's advisory verdict or to grant Reyes any award of front pay or back pay.

---

[71] Id. ¶ 7 n.4.

SO ORDERED.

Joseph N. Laplante
United States District Judge

Dated:  February 28, 2020

cc:     Bamily Lopez-Ortiz, Esq.
        Jason C. Weida, AUSA
        Susan M. Poswistilo, AUSA